UNITED STATES of America, Appellee,

v.

Michele SINDONA, Defendant-
Appellant.

No. 247, Docket 80–1270.

United States Court of Appeals,
Second Circuit.

Argued Sept. 29, 1980.

Decided Dec. 18, 1980.

John J. Kenney, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. for the Southern District, Charles M. Carberry, Richard F. Ziegler, Gregory L. Diskant, Asst. U. S. Attys., New York City, of counsel), for appellee.

Marvin E. Frankel, New York City (Proskauer, Rose, Goetz & Mendelsohn, Stephen E. Tisman, New York City, of counsel), for defendant-appellant.

Before MULLIGAN and TIMBERS, Circuit Judges, and NICKERSON,* District Judge.

* United States District Judge of the Eastern District of New York, sitting by designation.

MULLIGAN, Circuit Judge:

Michele Sindona appeals from a conviction by a jury which found him guilty on 65 counts of a 69 count indictment. The conviction followed a nine week trial in the United States District Court for the Southern District of New York (Thomas P. Griesa, Judge). We affirm the conviction on all counts.

The appellant, an Italian financier, was alleged to have controlled an international group of banks and corporations in the early 1970s. Partially as a result of conduct underlying this prosecution, the Franklin National Bank (Franklin), in which Sindona owned 21.6% of the outstanding stock and was a director, was declared insolvent on October 8, 1974. On January 11, 1980, a superseding indictment consisting of sixty nine counts[1] was filed against Sindona. The first count charged the appellant, Sindona, and Carlo Bordoni[2] with conspiracy to defraud the United States and various departments and agencies thereof in violation of 18 U.S.C. §§ 656, 1001, 1005, 1014, 1341, 1343; 15 U.S.C. §§ 78j(b) and 78ff; and Rule 10(b)(5) (17 C.F.R. 240.10–b–5). The remaining substantive counts charged Sindona with a scheme to defraud Franklin and the United States by: misapplying $15 million of bank funds in October 1972 in violation of 18 U.S.C. § 1343 (Counts 2–7) and 18 U.S.C. § 656 (Count 8); making secret payments or bribes to a senior officer of Franklin, Peter R. Shaddick, thereby inducing Shaddick to enter false information in Franklin's books in violation of 18 U.S.C. § 1343 (Counts 9–11); and causing Franklin to enter into fictitious foreign exchange transactions in order to portray a profit in violation of 18 U.S.C. §§ 1341 and 1343 (Counts 12–48). Sindona was further charged with causing false entries to be made in Franklin's books, reports and statements in violation of 18 U.S.C. § 1005 and 12 U.S.C. §§ 1841(a)(1) and 1847 (Counts 49–51); causing falsified statements of Franklin to be submitted to the Manufacturers Hanover Trust Company in order to obtain a loan and extension of credit in the amount of $35 million to Franklin in violation of 18 U.S.C. § 1014 (Counts 51–53); perjury before the Securities and Exchange Commission in violation of 18 U.S.C. § 1621 (Count 54); and use of the United States mails to engage in a manipulative scheme with respect to the purchase and sale of Franklin stock in violation of 15 U.S.C. §§ 78j(b) and 78ff as well as Rule 10(b)(5) (17 C.F.R. 240.10–b–5) (Counts 55–69). Counts 56, 63, and 68 were dismissed by the court with the remaining counts renumbered 1 through 66. The jury, after six days of deliberations, found Sindona guilty on all but count 9, one of the wire fraud counts. Judge Griesa sentenced Sindona to twenty-five years and a fine of $207,000.[3]

The financial machinations of Sindona were indeed massive, complicated and unscrupulous, wreaking financial disaster upon banking and financial institutions as

---

1. An original 99 count indictment naming Michele Sindona and Carlo Bordoni as defendants was filed on March 19, 1979. The charges in the original and superseding indictment were essentially the same with some variation. Counts 2–13 of the earlier indictment were dismissed on motion by the Government. See infra. Counts 61–75, 76, 79 and 83 of the earlier indictment were not included in the superseding indictment and counts 77, 78, 80, 81 and 82 of the original indictment were reduced and appear as counts 49, 50, 51, 52 and 53 of the latter indictment.

2. Bordoni has previously pleaded guilty to various charges in an indictment filed against him and other officers and a director of Franklin, 75 Cr. 948, as well as the conspiracy count in the original indictment filed in this prosecution. He was the managing director of Banca Unione in Milan. Bordoni's testimony was central to the prosecution of this case as well as in the trial of *United States v. Gleason*, No. 78 Cr. 522 (S.D.N.Y. March 29, 1979). After testifying in these actions Bordoni was sentenced to 7 years imprisonment and a fine of $20,000.

3. The sentence was computed by dividing the counts into four groups and imposing consecutive sentences within each group. The sentences for each group would then run concurrently with the sentences for the other groups while the fines remained cumulative. The sentences and fines were:

| | | |
|---|---|---|
| Counts 1, 10, 11, 55–66 | 25 Years, | $132,000 |
| Counts 2–8 | 25 Years, | $ 11,000 |
| Counts 12–48 | 25 Years, | $ 37,000 |
| Counts 49–54 | 24 Years, | $ 27,000 |

well as economic and personal tragedy upon the persons involved including, of course, the principal architect of the scheme, Sindona himself. Sindona does not attack his conviction on all counts on his appeal but focuses upon six specific alleged errors. We see no point in setting forth in detail all the manipulations employed but will address the facts so far as they are applicable to the errors claimed.

## I. *Paragraph 35*

Viewing the evidence as we must in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there clearly was sufficient evidence for the jury to have found that in mid-1972, Sindona acquired 21.6% of the outstanding shares of Franklin at a price of $40 million. The money was obtained from Italian banks through the use of a fiduciary deposit system. Under this system, Banca Privata Finanziaria (BPF) and Banca Unione (BU)[4] placed the money on time deposits at the Privat Kredit Bank and Amincor Bank in Zurich, Switzerland and recorded these placements on their books. The Swiss banks, however, transferred the funds to a Sindona owned corporation, Fasco International, by means of a secret "fiduciary contract" whereby the Swiss banks would not be liable for repayment to the Italian banks unless and until the Sindona corporation repaid the Swiss banks. These arrangements were concealed from the Italian authorities and were not reflected in the banks' records. On July 24, 1972, Sindona falsely represented, in a statement filed with the Securities and Exchange Commission, that the funds used to acquire Franklin were his personally. Although this statement was later amended to indicate that the funds belonged to Fasco International, no mention was made of the fiduciary contract. Moreover, in 1974 Sindona once again stated during an SEC investigation into the collapse of Franklin that the funds were his personally and that there was no debt connected with them. In April, 1973, Sindona and Bordoni employed a similar scheme whereby Sindona received

slightly over $27 million with which he acquired Talcott, a large American financial corporation. It was Sindona's intention to bring about the merger of Franklin and Talcott in order to improve Franklin's earnings as well as securing greater credit for Franklin in the international banking network. Once again, Sindona reported to the SEC that the funds used to acquire Talcott were his personally.

This conduct formed the basis of paragraph 35 of the indictment which was alleged to have been the first object of the conspiracy. In addition, the original indictment filed against Sindona on March 19, 1979 included twelve substantive counts based upon these transactions. These substantive counts were later dropped from the indictment on a motion by the Government.

Paragraph 35 states that:

[i]t was part of said conspiracy that Sindona and Bordoni, among others, would fail to disclose and would actively conceal from the interested United States authorities and other persons, that the money used to purchase Sindona's interest in the Franklin N.Y. Corp. and Talcott was fraudulently and illegally removed from the general deposits of BU and BPF, banks which Sindona controlled in Italy.

Sindona's only defense to this or any charge in the indictment was documentary evidence which showed that Sindona had repaid the $67 million involved and, therefore, these transactions were legitimate loans with no fraud or illegality involved. The court below, however, instructed the jury that it could convict Sindona of conspiracy based upon paragraph 35 as long as they found that Sindona concealed from the regulatory authorities material facts of whatever nature relating to the source of the funds and that they need not find that the funds were fraudulently and illegally removed from Italian banks. This charge to the jury is alleged to be an impermissible variance from the charge in the indictment and constitutes appellant's first claim of error on appeal. In addition, Sindona claims that the Government failed to show

---

**4.** Sindona effectively controlled both banks through direct and indirect stock ownership. In addition, he was a director and member of the executive committee of each bank.

a separate agreement to conceal these alleged Italian loans, or "crimes," and thus, the conspiracy conviction should be reversed pursuant to *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

Paragraph 35 of the indictment in sum, charged that one of ten objects in the conspiracy between Sindona and Carlo Bordoni was to "fail to disclose and . . . actively conceal from the interested United States authorities . . ., that the money used to purchase Sindona's interest in the Franklin N.Y. Corp. and Talcott was *fraudulently and illegally removed from the general deposits of BP and BPF, banks which Sindona controlled in Italy*." (emphasis added). Sindona contends that throughout the pretrial discovery period, and even during the presentation of its case in chief, the position of the Government was that Sindona had been charged with concealment of the Italian crimes of embezzlement and fraud. Thus, he argues that if the Government failed to prove that the method utilized to obtain the acquisition funds was illegal then there could not be a conviction for conspiracy based upon the object in paragraph 35. Sindona urges that the Government suddenly changed positions by arguing to the judge below that he could be convicted based upon paragraph 35 as long as the jury found that he had *concealed* material information of *whatever nature*. Thus, if the jury found that Sindona concealed the source of the funds used to acquire the Franklin and Talcott shares from the SEC, it would be able to convict Sindona of conspiracy to defraud the United States in violation of 18 U.S.C. §§ 656, 1001, 1014, 1341, 1343; 15 U.S.C. §§ 78j(b) and 78ff; as well as Rule 10(b)(5) (17 C.F.R. 240.10–b–5). This turnabout is alleged to constitute an illegal amendment of a grand jury indictment by the Government. *Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 272, 273, 4 L.Ed.2d 252 (1960).

■ In response, the Government argues that there never was an amendment or "variance" from the indictment. We agree.

In response to a defense request for a bill of particulars relating to paragraph 35, the Government referred defense counsel to the original counts 2 through 13 of the original indictment which had been dismissed. Paragraph 5(iii) of the original indictment states that the transfers from the Swiss banks to the Sindona corporation "would be treated by the Swiss bank[s] as a *loan* made on behalf of BU or BPF." (emphasis added). Moreover, at paragraph 8 of that same indictment, the grand jury stated:

8. It was further a part of said scheme and artifice to defraud that *SINDONA at all times represented that these moneys were his personally, belonged to companies he owned or to investors. At no time did he reveal that the source of these funds were the general deposits at BU or BPF or that the funds had been fraudulently and illegally removed from said banks.* (emphasis added).

A fair reading of these paragraphs would put one on notice that the core of the crime charged was the concealment of the source of the funds and not the illegality of the fiduciary system employed in Italy. Indeed, an earlier opinion of this court so construed this same paragraph:

Count 1 alleges active concealment and failure to disclose the fraudulent source of funds for these acquisitions as one of the objects of the broader Sindona-Bordoni conspiracy (¶ 35).

*Sindona v. Grant*, 619 F.2d 167, 171 n.4 (2d Cir. 1980). This court, in a similar context, has held that where the crime charged is one of making false statements to federal regulatory authorities:

the "core of criminality" is not the substance of the false statements but rather that knowing falsehoods were submitted to the [agency].

*United States v. Bernstein*, 533 F.2d 775 (2d Cir.), cert. denied, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). Thus, the Government was not required to specifically denominate the substance of what was concealed. The very concealment of the fact that the funds were not Sindona's, personally, constitutes the "core of criminality." If

the SEC had been notified that the funds used to acquire Franklin and Talcott were obtained by means of a fiduciary contract, whether legal or illegal, it would have at least caused further inquiry into the matter. This is the "evil" of the concealment. For the foregoing reasons, we are compelled to find that there was, in fact, no variance between the pleadings and the proof.

██ In any event, even if this court were to find that there was a variance, we must still affirm the appellant's conviction. Under Fed.R.Crim.P. 52(a), any "variance which does not affect substantial rights should be disregarded." In *United States v. Berger*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935), the Supreme Court enunciated the two prong test to determine whether substantial rights had been affected. First, the accused must be definitely informed of the charges against him so that he might be able to present a defense without surprise by the evidence at trial. Second, substantial rights would be affected by a variance which would render the defendant susceptible to another prosecution for the same offense. Because we find that Sindona cannot meet either part of this test, we hold that even if there was a variance in this matter, there was no prejudice to Sindona.

Sindona has attempted, on this appeal, to establish that he was surprised by the "shift" of the Government late in the trial. Indeed, as Sindona points out, the judge below was at one point confused by the Government's argument that it need not prove the illegality of the fiduciary contracts in Italy. Upon argument by counsel below, however, the judge quickly realized that the Government's position was correct. This apparent confusion, after many weeks of testimony, might well have been the result of defense counsel's continuous references to "embezzlement" and fraudulent loans, and not the Government's shift of position. As early as July, 1979 during discovery, the Government responded to an inquiry by the judge below that it need not prove a violation of Italian law. Thus, it

appears that the defense was aware that the Government never intended to prove an Italian crime.

██ Appellant relies on *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) for a broad prohibition of any variance between pleading and proof. In *Stirone* the defendant had been indicted for and convicted of interference with interstate commerce by extortion. The only interstate commerce referred to in the indictment was the importation of sand into Pennsylvania to be used in building a steel plant there. The judge, however, instructed the jury that it could convict the defendant for interference with the importation of sand *or* the exportation of steel from the completed steel mill. The Supreme Court reversed, reasoning that the defendant had been tried on charges in addition to those returned by the grand jury. There was no indication that the grand jury would have considered interference with the exportation of steel from a still to be completed steel mill a sufficient jurisdictional predicate. This court has consistently construed *Stirone* narrowly. See, e. g., *United States v. DiFrancesco*, 604 F.2d 769 (2d Cir. 1979), rev'd on other grounds, —— U.S. ——, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Knuckles*, 581 F.2d 305 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Brozyna*, 571 F.2d 742 (2d Cir. 1978). In *Knuckles, supra*, the defendant had been charged with the crime of distribution of heroin in violation of 21 U.S.C. § 841. At trial, the defense put in evidence that in fact the substance was cocaine. The trial judge, however, charged the jury that it could convict the defendant for distribution of heroin or cocaine. This court affirmed the defendant's conviction, finding no substantial prejudice in the variance between the indictment and the proof. We stated that whereas in *Stirone, supra*, there was a complex set of facts, in *Knuckles*, there was only a single set of facts—"the time, place, people, and object proved at trial are in all respects those alleged in Count Two of the indictment." *United States v. Knuckles*,

*supra,* 581 F.2d at 311. Accord, *Jackson v. United States,* 359 F.2d 260 (D.C.Cir.), cert. denied, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966). So also, in the present case, whether or not the fiduciary contracts in Italy were "fraudulent and illegal," or legitimate loans, the time, place and object were the same—concealment of the source of the funds from the SEC. Thus, the variance, if any, could not have prejudiced the defendant in making his defense to Count I. Furthermore, it does not appear, nor does Sindona assert, that the Government could prosecute him *again* for this same offense. Thus, the second prong of the *Berger* test, *supra,* has also been complied with. We conclude therefore that the variance, if any, was not so substantial as to warrant a reversal.[5]

■ Sindona further argues that even if there was no variance the Government failed to prove an independent agreement to conceal the Italian crimes, relying upon a trilogy of cases. *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). The teaching of these cases is, clearly, that:

> after the central criminal purposes of a conspiracy have been obtained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.

*Grunewald v. United States, supra,* 353 U.S. at 401, 77 S.Ct. at 972. However,

> a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the

conspiracy, and acts of concealment done after the central objectives have been obtained, for the purpose only of covering up after the crime.

*Id.* at 405, 77 S.Ct. at 974. See also *Ingram v. United States,* 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). This court, in *United States v. Colasurdo,* 453 F.2d 585 (2d Cir. 1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972) has held, on facts similar to the present case, that concealment from the SEC of the use of assets of one corporation to take over a second corporation was a means of furthering the main objective of the conspiracy—the take-over of the corporation. Thus *Grunewald* did not apply. So here, the main object of the conspiracy charged was not to obtain money from the Italian banks. Rather, the conspiracy was not complete at least until Sindona had acquired the stock of Franklin and Talcott. Thus, concealment from the SEC of the source of the funds used to acquire the stock was imperative—and in furtherance of the conspiracy. As such, no independent proof of an agreement to conceal was required.

The Government fully and convincingly demonstrated that secret loans to Sindona shells had been engineered, that these funds provided the means to purchase Talcott and Franklin and that the source of these funds was concealed from the SEC through the misrepresentations of Sindona. This was the conspiracy alleged in paragraph 35 and there was no necessity to establish that Sindona had committed the crime of embezzlement in Italy. As we have pointed out under *Grunewald* no independent proof of separate conspiracy to conceal the source from American authorities was required. It was part and parcel of the conspiracy charged in paragraph 35. We therefore reject the appellant's first alleged error.

---

**5.** The Government has also argued that since Sindona was convicted on 64 of 65 substantive counts which were directly related to the other nine objects of the conspiracy charged in Count One, the jury unequivocally found Sindona guilty of these remaining objects. Thus, where one object of a conspiracy is successfully challenged on appeal but where the record indicates that the jury convicted the defendant on the remaining objects, this court will not upset

the conviction. See, *e. g., United States v. Anzalone,* 626 F.2d 239 (2d Cir. 1980); *United States v. Dixon,* 536 F.2d 1388 (2d Cir. 1976); *United States v. Papadakis,* 510 F.2d 287 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Because we find no variance between the indictment and proof or in any event an insubstantial one, we need not address this argument.

## II. *The Interbanca Repayment*

In October, 1972, BU ran short of money. Sindona and Bordoni were alleged to have arranged a system whereby Franklin would accept deposits totalling $15 million in Italy which were placed by Franklin at Interbanca as a time deposit. These funds were then released to Amincor pursuant to an oral fiduciary contract similar to the one used to obtain the acquisition money, *supra*, whereby Interbanca would not be liable for repayment to Franklin unless and until these sums were repaid to it by Amincor. This transfer was expedited by the payment of $105,000 to a secret account of the general manager of Interbanca, Gino Uglietti. In turn, Amincor gave the funds to BU under a second fiduciary contract. The records of Franklin indicated only a $15 million time deposit at Interbanca. The Government charged that this conduct constituted wire fraud (Counts 2–7) as well as misapplication of bank funds (Count 8). In addition, these acts were alleged to be the second and fourth objects of the conspiracy (Count 1 ¶¶ 36, 38) as well as the means and overt acts (Count 1 ¶¶ 49, 50, and 55(h)–(n)). In defense, Sindona intended to introduce evidence which would show that in 1975 Interbanca paid $13 million as settlement of civil suits brought against it by the Federal Deposit Insurance Corp. (FDIC) and Sindona on behalf of Franklin.[6] The trial judge, over Government objection, initially permitted the defense to promise such proof in its opening statement to the jury. Later the court changed its position and precluded the proof as irrelevant to any issue in the case. However, Judge Griesa did permit the Government to show that in October 1974, when payment was originally demanded, Interbanca refused, relying on the oral fiduciary contract. This series' or rulings is attacked by Sindona in his second claim of error.

■ At the outset, we note that a judge's ruling on relevance and admissibility under Fed.R.Evid. 403 is a discretionary one. *Hamling v. United States*, 418 U.S.

87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Aulet*, 618 F.2d 182 (2d Cir. 1980). Thus, the ruling will be reversed only if an abuse of discretion can be shown. *United States v. Aulet, supra.* Under Rule 403, a judge may exclude relevant evidence if he finds that "its probative value is substantially outweighed by the danger of ... confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time...." In the present case, it is not at all clear that the repayment by Interbanca is even relevant. Under Fed.R. Evid. 401, relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The only probative value associated with the repayment by Interbanca would either be to show that Franklin suffered no loss or that in 1972 Sindona did not intend to misapply Franklin's funds. In *United States v. Fortunato*, 402 F.2d 79 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969) we held that under 18 U.S.C. § 1343, loss to the victim need not be shown in order to prove a violation. Thus, an absence of loss to Franklin is irrelevant. The repayment by Interbanca as evidence of Sindona's 1972 intent is similarly irrelevant. "The offense occurred and was complete when the misapplication took place. What might have later happened as to repayment is not material and could not be a defense. The immediate intent to misapply and defraud was established by the evidence." *United States v. Acree*, 466 F.2d 1114, 1118 (10th Cir. 1972). "A wrongful misapplication of funds even if made in the hope or belief that the bank's welfare would ultimately be promoted is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank. Such is the well settled rule." (citing cases). *Mulloney v. United States*, 79 F.2d 566, 584 (1st Cir. 1935). This court, in *United States v. Chiarella*, 588 F.2d 1358, 1371 (2d Cir. 1978),

---

**6.** The $13 million dollar figure was later shown to consist of $10 million of the $15 million principal plus $3 million in interest plus 50% of any excess sums recovered by Interbanca.

rev'd on other grounds, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), found it difficult to understand how agreeing to an SEC restitution decree would indicate the defendant's state of mind years earlier.

So also, Sindona's suit to compel repayment after the FDIC had brought suit against him and during an SEC and grand jury investigation into the Franklin collapse in 1974, sheds little light on his state of mind in 1972. The trial court received testimony from the counsel for the FDIC in the suit against Interbanca. Mr. Pierpoint testified that a special statute of frauds was available to the FDIC.[7] Thus, Interbanca was destined to lose as between the FDIC and Interbanca and, therefore, Interbanca settled. It was questionable whether this defense would be available in Sindona's suit against Interbanca. In any event, it became quite obvious that if evidence of the repayment was admitted, the Government would attempt to put in proof of the oral fiduciary contract as well as the reasons for the repayment, all of which would entail delay and confusion. Thus, it appears that these risks outweighed the scant probative value of this evidence, which in any event is doubtful at best.

■ Furthermore, it does not appear that the judge's second ruling prejudiced the defendant. *Miller v. Poretsky*, 595 F.2d 780, 784 (D.C.Cir.1978). In *Miller*, the trial judge specifically ruled before trial that a certain line of proof would be admissible, but later precluded its admission. The Court of Appeals held that this was error because "representations made at [a pretrial conference] should only be reneged upon with great reluctance, usually only to prevent manifest injustice ...." *Id.* at

784. In *Miller*, the trial judge had heard an offer of proof. In the present case, the judge was only informed that the defense intended to show repayment of $13 million, not that the actual figures were $10 million plus $3 million in accrued interest and fifty percent of any excess sums received by Interbanca. Moreover, the trial judge indicated that his first ruling was simply on the question of whether the defense could mention the repayment in its opening, but that detailed objections would be heard later on.[8] Thus, the defense was clearly on notice that it might be precluded later during the trial from introducing evidence on repayment.

■ Sindona further argues that because the judge permitted the Government to show Interbanca's refusal to pay when repayment was originally demanded from Interbanca in October 1974, the defense should also have been permitted to show the eventual repayment. This argument is without merit. When Interbanca originally refused to pay, it relied upon the oral fiduciary contract. Such evidence was highly relevant to the charge of misapplication of bank funds which were recorded on Franklin's books as a time deposit at Interbanca. Moreover, the trial court's refusal to give the instructions requested by the defense, which would have effectively put the repayment into evidence, was proper because the instructions went beyond the evidence in the case. See, e. g., *United States v. Gallagher*, 576 F.2d 1028, 1043 (3d Cir. 1978). Thus, unlike *Miller v. Poretsky, supra*, we are unable to find prejudice sufficient to warrant reversal on this issue. We conclude that the evidentiary rulings attacked on appeal do not constitute reversible error.

7. Under 12 U.S.C. § 1823(e), the FDIC, as liquidator, was protected from enforcement of any agreement "which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section ... unless such agreement (1) shall be in writing ...."

8. The judge stated that:
 I cannot preclude the defense *at this stage* in the trial from arguing that the original intent was proper as evidenced by the subsequent events. (emphasis added).

He repeated,
 The objection is overruled *at this point*. I will of course, hear detailed objections later on. (emphasis added).
Later, in ruling on a related point, the judge said
 I have no desire to restrict your opening, and, look, I am not going over every point that the attorneys make to see whether they will be able to introduce evidence on it later on.

### III. *Jurisdiction Over Counts 10 and 11* [9]

Counts 10 and 11 charged Sindona with wire fraud in connection with illegal payments to Peter R. Shaddick [10] who was formerly Executive Vice President of the Bank of Montreal. Sindona wanted Shaddick to take a position on the board of directors at Franklin and was willing to give him carte blanche to expand Franklin's foreign exchange trading department. The Government showed that Sindona secretly deposited $100,000 in a "Mr. New" account at Banque de Financement ("Finabank") for Shaddick's account. The $100,000 was characterized as an "interest free" loan. Shaddick eventually repaid the $100,000 without interest. In addition, Shaddick was permitted to speculate in foreign currency for his own account with a guarantee against loss from Sindona. Shaddick's tradings resulted in a $476,000 personal profit. Bordoni deposited $471,000 of this amount in the "Mr. New" account and delivered the remaining $5,000 to Shaddick in New York. In 1974, Shaddick wired to Finabank to transfer the sum of $400,000 to his personal accounts at the Bank of Montreal. These transfers by wire were alleged to be the jurisdictional predicate underlying counts 10 and 11. Sindona claims that the crime, if any, was complete upon the deposits in the "Mr. New" account and therefore there was no jurisdiction over the crimes charged in these counts.

 A scheme to defraud is not complete until the proceeds have been received and use of the mail or wires to obtain the proceeds satisfies the jurisdictional element. *Pereira v. United States*, 347 U.S. 1, 7–9, 74

S.Ct. 358, 362–363, 98 L.Ed. 435 (1954). Appellant's reliance upon cases such as *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) is misplaced. In those cases, the use of the mails or wires was by an innocent third party of no consequence to the defendant's scheme; the crime had been completed. In the present case, there was sufficient evidence for the jury to find that Sindona effectively controlled the Finabank bank in Switzerland. Thus, until Shaddick arranged to transfer the funds to his accounts at the Bank of Montreal the crime was not complete and, therefore, these latter wires were sufficient for jurisdictional purposes. See *United States v. Toliver*, 541 F.2d 958, 966–67 (2d Cir. 1976); *United States v. Isaacs*, 493 F.2d 1124, 1151–52 (7th Cir.), cert. denied *sub. nom. Kerner v. United States*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

### IV. *The Evidentiary Rulings*

During the investigations leading to the present prosecution, the Government, through Requests for International Judicial Assistance, obtained statements from three potential witnesses, Gino Uglietti, Luigi Mazzilli and Giorgio Binda, Italian citizens, who were employees of Interbanca at the time of the $15 million transaction described above. In April, 1979, a Government attorney received assurances from the three that they would voluntarily come to the United States to testify in this prosecution. In the fall of 1979 the Government inquired, through Italian authorities, whether a fourth witness, Giorgio Scianca would voluntarily come to the United States. The Italian authorities reported that he would

---

**9.** Counts 10 and 11 charge Sindona with violation of 18 U.S.C. § 1343 which states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not

more than one thousand dollars or imprisoned not more than five years, or both.

**10.** Shaddick was indicted along with Bordoni and other officers of Franklin and pleaded guilty in December 1975. He testified for the Government in this case as well as in *United States v. Gleason, supra*, n.2. After his testimony in this case, he was sentenced to 3 years imprisonment and fined $20,000.

do so. On January 10, 1980, the eve of trial, the Government learned that Mazzilli and Scianca were refusing to attend the trial. In addition, Binda and Uglietti, although still professing a willingness to come, had not at that point procured the necessary travel documents. Therefore, on January 11, 1980 the Government made, and the court granted, a motion pursuant to Fed.R. Crim.P. 15 to depose the four witnesses in Milan, Italy which was done on January 23 and 24 of that same year.[11] At the depositions, Mazzilli and Scianca reasserted their unwillingness to testify in the United States. Moreover, Scianca stated that he had not been contacted by the Italian authorities until January 8, 1980. Binda and Uglietti stated that they were still willing to come to the trial to testify. On February 14, 1980, however, the Government attorney orally reported to the court that he had been informed by a United States Consulate employee in Italy that the four witnesses were refusing to travel to this country. The judge thereupon permitted the government to introduce the depositions into evidence, over defense objections. Sindona attacks these rulings.

A second ruling which is challenged on appeal was occasioned when the Government counsel inadvertently received a letter from the offices of the defense attorney in this action describing material to be used in the cross-examination of Carlo Bordoni, the Government's star witness. The material had been prepared by Bordoni, at the request of his Venezuelan attorney, as an aid in his representation of Bordoni in extradition proceedings brought by the United States to return Bordoni to answer an indictment against him in this case. In this material, Bordoni was alleged to have made several statements inconsistent with his position on the stand at Sindona's trial. Upon objection by Bordoni's present attorney and after an *in camera* review of the material the judge ruled that it was protected by the

attorney-client privilege which was never waived by Bordoni. Thus, he precluded the defense from using it on cross-examination.

### 1. The Depositions

Fed.R.Crim.P. 15(a) provides that in exceptional circumstances, and if it is in the interest of justice, the testimony of a prospective witness may be taken by deposition and preserved for use at trial. A ruling by a trial judge on a motion pursuant to Rule 15(a) will not be reversed absent a clear abuse of discretion. *United States v. Wilson*, 601 F.2d 95, 97 (3d Cir. 1979); *United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962), cert. denied, 372 U.S. 919, 83 S.Ct. 734, 9 L.Ed.2d 725 (1963). In the present case, it appears that the Government presented the district court with sufficiently exceptional circumstances. The judge, in our view, acted well within his discretion. None of the four witnesses were subject to subpoena. Moreover, as the Government had informed the court in its motion, two of the prospective witnesses had specifically refused to come to the United States as of January 11. In addition the remaining two witnesses, Binda and Uglietti, had not yet obtained the necessary travel documents on that date. Thus, there was ample reason to fear that all four witnesses would fail to appear at the trial. Sindona, however, attempts to avoid this inescapable conclusion by asserting that the Government had misrepresented the situation in its motion papers, and therefore, the judge was deceived into granting the motion. We do not accept this argument. The judge below had been informed that at least two witnesses had refused to come to this country. Thus, the fact that Binda and Uglietti testified at the deposition that they were still willing to come does not render the Government's statements misleading. The Government's secrecy as to the exact identity of the willing witnesses seems justified in light of the

---

11. The lower court originally ordered that the depositions would be conducted simultaneously with the trial. A petition for a writ of mandamus was made to this court. After oral argument, but before a decision on the petition, the parties agreed upon a delay which would allow the defense lead counsel to attend the depositions. This agreement was approved by the lower court and the mandamus petition was withdrawn.

fact that Uglietti had professed concern over the murder of Giorgio Ambrosoli, a potential government witness. In addition, Scianca's revelation that he had not been contacted by the Italian authorities until January 8, 1980 does not render the Government's statement untrue. Whether or not Scianca was correct, it appears that the Government, in good faith, relied upon the Italian authorities' representations that they had contacted Scianca earlier. The Government, therefore, was justified in so informing the trial judge. Finally, the fact that Mazzilli might have been deposed in Luxembourg rather than in Italy does not support a finding of misrepresentation by the Government. Indeed, the defense never indicated that Sindona wished to attend the depositions, nor was there any motion to change the place of deposition, Fed.R. Crim.P. 15(b). Thus, there was no reason to investigate the residence of Mazzilli. Having found that the Government did not misrepresent the factual situation to the trial judge, and that there were exceptional circumstances, we find that the judge did not abuse his discretion in granting the Government's motion to take depositions.

■ Furthermore, we find that the Government had made good faith efforts to obtain the witnesses' presence at the trial. Thus, having failed in this effort, the Government was entitled to introduce the depositions of the witnesses into evidence. *Ohio v. Roberts*, — U.S. —, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The prosecution in *Roberts* had been in contact with the witness for four months and had attempted to subpoena her. In the present case, the prosecution had been in contact with three of the witnesses for almost one year and with the fourth for four to six months. These witnesses were not subject to subpoena. Moreover, the Government had promised to pay all expenses of the witnesses. Thus, when the prosecutors were informed by a consular employee that these witnesses were refusing to come to the United States, the Government had done all that it could. The witnesses were "unavailable" for purposes of Fed.R.Evid. 804(a)(5), as well as

Fed.R.Crim.P. 15(e). *United States v. Seijo*, 595 F.2d 116 (2d Cir. 1979). Moreover, the constitutional standard of good faith efforts, for purposes of the Sixth Amendment confrontation clause has also been met. *Ohio v. Roberts, supra.* Although it would have been preferable to present the court with affidavits, the fact that the trial counsel for the Government presented the factual situation orally is not fatal. It is proper for the court to accept, in its discretion, the representations or counsel with respect to the unavailability of a witness. *Bailey v. Southern Pacific Transp. Co.*, 613 F.2d 1385 (5th Cir. 1980). In addition, there is no reason, on these facts, to assume that the Government lied. We therefore find that the trial judge properly admitted the depositions into evidence.

### 2. The Attorney-Client Privilege

■ We must also affirm the lower court's ruling precluding the cross-examination of Bordoni based upon material obtained from Bordoni's Venezuelan attorney. Although this court has permitted an attorney to respond to an attack by a client by releasing confidential matters to defend himself, see, e. g., *Meyerhofer v. Empire Fire and Marine Insurance Co.*, 497 F.2d 1190 (2d Cir.), cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974), this case does not present such a situation. Although Bordoni may have previously implicated Martinez in certain statements he has made, a review of the material which the defense proposed to use in the present case does not reveal anything which defends Martinez or clears his name. Thus, reliance upon *Meyerhofer, supra*, is misplaced.

■ Sindona's second argument, based upon an analogy to the exclusionary rule applied to evidence seized in violation of the fourth or fifth amendments is likewise inapt. The exclusionary rule is utilized to deter official misconduct. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Thus, evidence seized by private parties and then turned over to the police is not barred because to do so would not deter

official misconduct. The attorney-client privilege, on the other hand, is granted in order to foster full and open communication between the attorney and his client. 8 Wigmore on Evidence § 2291 (McNaughton ed. 1961). If information obtained as a result of a violation of that privilege were permitted to be used against the client on cross-examination, it would destroy the attorney-client privilege. A client could hardly confide in counsel if this result were sanctioned. Exclusion of evidence obtained in breach of that confidence, as in this case, is proper. In any event, it appears that the defense did manage to cross-examine Bordoni on most of the area covered in the privileged memorandum. The exclusion of this evidence, therefore, did not significantly affect the cross-examination of Bordoni,

and indeed, much of it could have been excluded as cumulative. *United States v. James*, 609 F.2d 36 (2d Cir. 1979), cert. denied, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

We hold, therefore, that the trial judge properly excluded this information.

## V. *Summation*

Sindona's final contention is that the Government, in its rebuttal summation, (1) impermissibly commented upon the defendant's refusal to take the stand, (2) referred to matters not in evidence, and (3) impermissibly attempted to bolster Bordoni's credibility by vouching for him. The challenged statements are set out in the margin.[12] In addition, Sindona claims that the

---

12. The challenged statements allegedly referring to the defendant's refusal to testify were in reference to the documentary evidence showing repayment of the $67,000,000 used to purchase Franklin and Talcott. In rebuttal, the Government attorney stated:

> Now, in response, Sindona does not come in here and call a lot of witnesses and introduce a lot of documents as you might expect, saying, "Listen, I had $40 million, and I invested it in this bank, and I lost my money."
>
> Well, he makes the argument but where are the witnesses, where are the documents?
>
> Can you have $40 million and not have anybody know where it is and where it came from? No accounts, no collateral?
>
> You can't, and the reason is because Bordoni was telling you the exact truth, and it is unbutted [sic], and it stands here telling you exactly what happened in this case, and there are no documents and no witnesses in the case that disagree with it.
>
> And what he is telling you is that Sindona did not have this money, and that he had developed a scheme to use the general funds of these banks for his own purposes, and he would record them as deposits at other banks.
>
> That could go on just as long as his bank could get deposits and just as long as he was able to repay or close these transactions, or pay the interest on these transactions as they became due.
>
> I am going to come to that now.
>
> What does Sindona do? Well, he still does not call anybody to explain these things, but he comes in with a lot of documents and he says, "These documents show that the money removed from the Italian banks was in fact repaid."

> Well, as Mr. Mack said in his summation, it doesn't make a whit of difference if these sums were repaid.

The statements which Sindona argues refer to evidence not in the record related once again to this repayment. The Government in rebuttal introduced documents to show that the money used to repay the "loan" was at least in part obtained pursuant to yet another fiduciary contract. Government counsel stated in rebuttal summation:

> It is repaid but you have another fiduciary contract of $20 million to Orana Investment, whatever that is, and there is probably banana and canana, an endless number of companies.

> This scheme goes on and on.
>
> What we have done is include a series of documents, 177 and 195 to show you how it works and Mr. Mack mentioned in his summation a number of documents showing you the $5 million, where the interest on the $5 million came from.
>
> We have not and we will not in this case call witnesses to explain this whole hug [sic] manipulation that is going on in Italy. What is important to this case is that these funds were removed from the general funds of the Italian banks and that the Italian banks did not reflect where that money went and there was a very good reason why they could not. It could not loan nearly that amount of money to the man who owned the bank.

> Getting the money off to Fasco International S.A. Mr. Sindona presented himself in New York, acquired the Franklin stock and there was a conspiracy to conceal and withhold the source of those funds from the federal regulatory authorities who were interested in that.

instructions given by the judge below inadequately cured the statements made by the Government and in fact aggravated the error by giving a liberal uncalled witness instruction. These instructions are also set out in the margin.[13]

The statements by the prosecution concerning Sindona's failure to rebut the overwhelming case against him, when viewed in the context of the entire summation, as we must, *United States v. Williams*, 583 F.2d 1194 (2d Cir. 1978), cert. denied, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979), and in light of the curative instruction given by the judge, do not warrant a reversal. It is settled law that the government may comment upon the defendant's failure to call witnesses. *United States v. Barnes*, 604 F.2d 121, 148 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), cert. denied, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). Thus,

> [a] constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to, or the jury "naturally and necessarily" would interpret the summation as a comment on the failure of the accused to testify.

*United States v. Bubar, supra*, 567 F.2d at 199. See also, *United States v. Alessi*, 638 F.2d 466, 481 (2d Cir. 1980). Applying this standard in *United States v. Barnes, supra*, this court considered a challenge by the prosecution to the defendant to explain large amounts of unreported income. This court reasoned that "[n]o jury could possibly think that no independent witness to the receipt of income existed." *United States v. Barnes, supra*, 604 F.2d at 148. So also, in the present case, no jury could reasonably conclude that Sindona was the only witness to the execution and implementation of these fiduciary contracts. The only challengeable references to the defendant in this case, therefore, would be the use of the word "I" three times when referring to Sindona. The judge below, however, stated that based upon a cold record these references seemed more damaging than when he listened to them. In light of *United States*

---

That is our case. If there is a case in Italy and somebody wants to pursue it, that is fine. But it is not in this courtroom.

Finally, in response to an attack upon the credibility of Bordoni in the defense summation, Government counsel stated:

> In viewing their testimony, [defense counsel] is correct that Bordoni and Shaddick have a motive to lie, but you must also consider it's not Bordoni and Shaddick who are trying this case. *It's not Bordoni who sits behind the United States Attorney's desk and prepares the case that's presented to you.* (emphasis added).

**13.** The trial judge, in an attempt to cure any impropriety of the Government's references to "I" when speaking of Sindona's defense instructed the jury:

> Of course the government attorney did not suggest and could not suggest that you draw any inferences from the fact that the defendant himself did not testify. The argument at that point was directed solely to the suggestion that you might draw inferences from the fact that certain witnesses, witnesses entirely apart from the defendant, were not called.

The judge then went on to inform the jury that:

> I instruct you that the matter of drawing inferences from the absence of certain witnesses is a matter which must be dealt with strictly within the framework of logic and reason in the same way as the drawing of inferences in any other regard in this case. It is not a matter of mere speculation or curiosity.
>
> Before you can draw an inference against a party from the fact that any witnesses or types of witnesses were not called, there must be a logical and reasonable basis for drawing such inference; that is, there must be a positive reason for you to believe that such witnesses or types of witnesses were available to the party and that it would have been natural to expect that party to call the witnesses if their testimony would have been favorable.
>
> If you cannot go through this chain of reasoning, you should not draw any inferences from the absence of certain witnesses, and as I have indicated, you are duty bound not to even consider this matter in respect to the defendant himself.
>
> It follows from what I have said that it is entirely within your province to draw no inferences at all from the failure of any party to call certain witnesses or types of witnesses.

*v. Williams, supra,* where we held that the trial judge is in the best position to observe the effect of statements upon the jury, it would appear that these references to Sindona were not prejudicial statements upon the defendant's decision not to testify. In any event, Judge Griesa instructed the jury to disregard these statements. This instruction which is set out *supra,* is sufficiently similar to the one approved by this court in *United States v. Bubar, supra,* 567 F.2d at 200 n.10. Thus, any possible damage inflicted by these statements was cured by the instruction. For these same reasons, we find the appellant's challenge to the propriety of this instruction to be without merit.

■ We similarly find that the statement, in rebuttal, by the prosecution that Bordoni was not trying this case was not improper. In the defense summation, counsel for the defendant intimated that the prosecutors were the pawns of Bordoni. When the integrity of the prosecution is so attacked, we have upheld a retort similar to the one here. See *United States v. Praetorius,* 622 F.2d 1054 (2d Cir. 1979). We, therefore, do not find that this statement deprived the defendant of a fair trial.

■ In addition, we find that the appellant's remaining arguments on this issue are without merit. The Government did not refer to matters not in the record. The challenged remarks were in rebuttal to the defense that Sindona had repaid the $67 million dollars used to purchase Franklin and Talcott. The Government had introduced evidence which would show that these repayments were further fiduciary contracts, and, therefore, the entire transaction was a "wash." In referring to this evidence, while the prosecutor might have been somewhat carried away by a "forensic zeal," see *United States v. DeAlesandro,* 361 F.2d 694, 697 (2d Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966), the appellant was not prejudiced. See *United States v. Alessi, supra,* 638 F.2d at 480–481. We also find that the trial court's missing witness instruction was in accord with the settled law in this circuit. See, e. g., *United*

*States v. Erb,* 543 F.2d 438, 445 (2d Cir.), cert. denied, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976).

Appellant's contentions that Sindona was unfairly tried and improperly convicted have not been sustained by the record or the arguments made. We conclude that he was properly convicted after a fair trial and his conviction is affirmed.