DART CONTAINERLINE COMPANY
LIMITED, Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

North Carolina State Ports Authority,
Delaware River Port Authority
et al., Intervenors.

No. 79–1932.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1980.

Decided Jan. 26, 1981.

Allan J. Berdon, New York City, for petitioner. Edwin Longcope, Washington, D. C., was on the brief for petitioner.

Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., was on the brief, for respondent Federal Maritime Commission.

Dennis P. Myers, Asst. Atty. Gen. for the State of N. C., Raleigh, N. C., with whom Rufus L. Edmisten, Atty. Gen. for the State of N. C., Raleigh, N. C., was on the brief, for intervenor North Carolina State Ports Authority.

Martin A. Heckscher, Francis A. Scanlon and Martin J. Vigderman, Philadelphia, Pa., were on the brief for intervenors Delaware River Port Authority et al.

Warner W. Gardner and Edward M. Shea, Washington, D. C., were on the brief for amici curiae American President Lines, Ltd., et al.

Robert B. Nicholson and Robert J. Wiggers, Attys., U. S. Dept. of Justice, Washington, D. C., entered appearances for respondent U. S.

Before TAMM and MacKINNON, Circuit Judges, and JOHN H. PRATT,* U. S. District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Dart Containerline Company Limited (Dart), a common carrier by water, filed a tariff with the Federal Maritime Commission (Commission) under which Dart would receive containerized unmanufactured tobacco from shippers delivering such cargo to the port of Wilmington, North Carolina. Dart would then transport the tobacco at its own expense to the port of Hampton Roads, Virginia, from which the tobacco would be carried to its European destination. After a challenge to this tariff by the North Carolina State Ports Authority (Ports Authority), the Commission found the tariff in violation of the Shipping Act of 1916. We find that substantial evidence

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

supports the Commission's ruling and therefore affirm the action of the Commission.

## I.  BACKGROUND

### A.  *Procedural Background*

Dart is a common carrier by water operating in the foreign commerce of the United States.  Dart published a Freight Tariff No. 1, FMC–28, filed with the Commission on September 19, 1977, which provided for the carriage of unmanufactured tobacco in containers from the port of Wilmington, North Carolina to specified European ports at port-to-port rates.  The tariff provided that the port-to-port service would take place either by direct sailing or by water or overland substitute service.  The Ports Authority filed a complaint with the Commission, alleging that the tariff violated sections 16 and 17 of the Shipping Act of 1916. 46 U.S.C. §§ 815 & 816 (1976).[1]  After an evidentiary hearing and submission of briefs, an Administrative Law Judge (ALJ) delivered an initial decision on January 19, 1979, upholding the validity of the tariff. *North Carolina State Ports Authority v. Dart Containerline Co., Ltd. (ALJ Decision),* 18 S.R.R. 1499 (FMC No. 77–50, January 19, 1979), *reprinted in* Joint Appendix (J.A.) 126a–47a.  The Commission reversed this decision, holding that under the applicable standards the tariff unlawfully diverted cargo naturally tributary to the port of Wilmington and therefore could not be implemented.  *North Carolina State Ports Authority v. Dart Containerline Co., Ltd. (Commission Decision),* 19 S.R.R. 521 (FMC No. 77–50, June 28, 1979), J.A. 150a.  Dart then filed this appeal.

### B.  *Factual Background*

At bottom here is a dispute over the way in which unmanufactured tobacco will be transported from markets within North Carolina and Virginia to Europe.  Three ports handle the vast majority of all United States exports of unmanufactured tobacco: Hampton Roads, Virginia,[2] Morehead City, and Wilmington, North Carolina.  In 1977, for example, Hampton Roads handled approximately fifty-one percent of all such exports, Morehead City twenty-five percent, and Wilmington thirteen percent. *ALJ Decision,* 18 S.R.R. at 1506, J.A. 133a. Although the major United States tobacco producing markets are North Carolina and Kentucky,[3] the ALJ found that the greater bulk of the tobacco exported through Hampton Roads originated from supply points in North Carolina and Virginia.[4]  An

---

**1.**  The pertinent provisions of these statutes are as follows:

It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

First.  To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . .

46 U.S.C. § 815 (1976).

No common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors.  Whenever the Federal Maritime Commission finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimina-

tion or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge. 46 U.S.C. § 816 (1976).

**2.**  The port of Hampton Roads actually consists of five marine terminal areas in Norfolk, Portsmouth, Newport News, and Richmond.  ALJ Decision, 18 S.R.R. at 1505, J.A. 132a.  The ports were united under state ownership in 1970.  Hearing Transcript, vol. III, 291 (Sept. 26, 1978).  References to Norfolk or Hampton Roads should be read as the parties employed them, interchangeably.

**3.**  1980 World Almanac 134 (Newspaper Enterprise Association 1980) (source was Statistical Reporting Service of the United States Department of Agriculture).

**4.**  ALJ Decision, 18 S.R.R. at 1506, J.A. 133a. The export tobacco from the Kentucky area is apparently shipped by rail to the port of Charleston, South Carolina.  Hearing Transcript, vol. I, 55–57 (Aug. 29, 1978).

insignificant amount of tobacco exported through Morehead City moves to Europe;[5] furthermore, all cargo moving through that port does so in break-bulk as contrasted with the container service provided at both Hampton Roads and Wilmington.[6]

Ten carriers provide container service from Hampton Roads to Europe; each competes for the carriage of tobacco. Only two lines, Seatrain and Polish Ocean Lines, provide container service from Wilmington to Europe. Wilmington did not become a container facility until 1972 subsequent to Seatrain's decision to offer container service at that port. Id. at 1503–05, J.A. 130a–32a. In 1977 Wilmington handled 31,977 tons of unmanufactured tobacco in containers destined for Europe; this figure constituted 11.4 percent of Wilmington's total export cargo. Id. at 1504, J.A. 131a. In the same year Hampton Roads handled 126,287 tons of unmanufactured tobacco exported to Europe; this figure constituted approximately 7 percent of its total export cargo.[7]

Port terminal charges and ocean freight rates for containerized tobacco exports from Wilmington and Hampton Roads to Europe were equivalent at the time Dart published the tariff in question. Dart does not offer direct service between the port of Wilmington and European ports and does not intend to do so under the proposed tariff. Instead, Dart would provide overland substitute service at its own expense by using truck carriers to move loaded containers from the port of Wilmington to the port of Norfolk. Id. at 1502, J.A. 129a. This tariff has never been implemented.[8] Should this tariff divert from Wilmington all containerized unmanufactured tobacco, the Port would suffer an annual revenue loss of approximately $80,426. If Seatrain should decide to discontinue service to Wilmington as a result of a loss of tobacco carriage to Dart, the revenue loss to Wilmington would be approximately $213,455. Id. at 1507, J.A. 134a.

The Ports Authority introduced evidence of the distances and transportation rates between the major tobacco production centers in North Carolina and Virginia and the ports of Norfolk, Wilmington, and Morehead City. Exhibits 10 & 11, J.A. 104a &

5. In 1977, 1,868 of that port's total export figure of 83,455 short tons moved to European destinations. Exhibit 28, "1977 Exports of Unmanufactured Tobacco from North Carolina Ports," (Sept. 26, 1978).

6. ALJ Decision, 18 S.R.R. at 1505, J.A. 132a. "Break-bulk" cargo refers to packaged, nonfungible cargo in contrast both to bulk cargo, which is generally homogeneous and stowed loose in the hold of a ship, and containerized cargo, which is stored in large metal boxes the size of truck vans. Note, Containerization and Intermodal Service in Ocean Shipping, 21 Stan. L.Rev. 1077, 1077 & n.1 (1969).

7. No evidence exists to support the ALJ's finding of fact that unmanufactured tobacco represented 25 percent of Hampton Roads's export general cargo. ALJ Decision, 18 S.R.R. at 1506, J.A. 133a. The ALJ apparently arrived at this figure by adopting in part the even more inaccurate assertion made by one of Dart's witnesses that unmanufactured tobacco represented "approximately 25 percent of [Hampton Roads's] general cargo tonnage." Hearing Transcript, vol. III, 310 (Sept. 26, 1978). Taking as fact this same witness's assertion that Hampton Roads handled approximately three million tons of general cargo, and that sixty percent of this cargo was export (both facts adopted by the ALJ), the port's total documented export unmanufactured tobacco tonnage of 180,500 constituted only 10 percent of total export cargo. The tobacco destined for Europe, 126,287 tons, therefore constituted only 7 percent of the port's export cargo.

8. ALJ Decision, 18 S.R.R. at 1503, J.A. 130a. Concurrent with the filing of its complaint with the Commission, the Ports Authority obtained a temporary injunction from the United States District Court for the Eastern District of North Carolina. The Fourth Circuit vacated this injunction on appeal, finding that the probability of Ports Authority's success on the merits, in light of Council of North Atlantic Shipping Associations v. American Mail Lines, Ltd. (CONASA), 18 S.R.R. 774 (FMC No. 73–38, Aug. 8, 1978), and Board of Comm'rs of the Port of New Orleans v. Seatrain Int'l S. A. (Seatrain), 18 S.R.R. 763 (FMC Nos. 73–42, 73–61, 73–69, 74–4, Aug. 8, 1978), failed to compensate for the weakness of its evidence on irreparable injury. North Carolina State Ports Authority v. Dart Containerline Co. Ltd., 592 F.2d 749 (4th Cir. 1979). The Commission handed down its decision invalidating the tariff approximately four months later.

157a. Of these eleven centers,[9] six are closer to Wilmington than to Norfolk. Dart's Southeastern Region sales representative identified only seven major supply markets, five of which are closer to Wilmington. Hearing Transcript, vol. III, 329 & 355 (Sept. 26, 1978). The evidence of transportation charges consisted of quoted rates from five trucking lines of their containerized tobacco charges from the supply centers to the ports. Of the rates concerning the seven markets noted above, the lowest quoted rate between two of them and Hampton Roads was higher than the highest rate quoted for carriage between those centers and Wilmington.[10] Wilmington was slightly rate-favorable in the case of three centers; an identical range of rates was reported for one center; finally, a single shipper reported identical low rates for the last major supply center but several shippers quoted higher rates for the carriage to Wilmington from that center. Exhibit 10, J.A. 104a.

C. *Legal Background*

The Ports Authority claimed that Dart's proposed tariff violated sections 16 and 17 of the Shipping Act of 1916. 46 U.S.C. §§ 815 & 816 (1976).[11] Section 16 forbids a common carrier by water to "make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever...." Section 17 prohibits a common carrier by water in foreign commerce from demanding, charging, or collecting "any rate, fare, or charge which is unjustly discriminatory between shippers or ports...." In the context of cargo diversion from ports, the Commission has given content to these amorphous concepts of "undue or unreason-

able preference" and unjust discrimination through a long line of cases. *See, e. g., City of Mobile v. Baltimore Insular Line*, 2 U.S.M.C. 474 (1941); *Beaumont Port Commission v. Seatrain Lines, Inc.*, 2 U.S.M.C. 699 (1943), *modifying* 2 U.S.M.C. 500 (1941); *Sea-Land Services, Inc. v. South Atlantic and Caribbean Line, Inc. (SACL)*, 9 F.M.C. 338 (1966); *Intermodal Service to Portland, Oregon*, 17 F.M.C. 106 (1973).

Central to a ruling that sections 16 and 17 have been violated in a case involving diversion of cargo from a port is a finding that the diverted cargo originated from an area "naturally tributary" to the complaining port. The Commission based this concept of naturally tributary cargo at least in part upon the congressional policy articulated in section 8 of the Merchant Marine Act of 1920, 46 U.S.C. § 867 (1976), which speaks in terms of "territorial regions and zones tributary to ... ports" and which demands the investigation of any "matter that may tend to promote and encourage the use by vessels of ports adequate to care for the freight which would naturally pass through such ports...." *See Port of New York Authority v. FMC*, 429 F.2d 663, 668–70 (5th Cir. 1970), *cert. denied*, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). Until recently the Commission had spoken only in general terms in defining this concept: "The concept of naturally tributary cargo has as its purpose the maintenance of the movement of cargo through those ports which, because of a combination of geographic, commercial, and economic considerations, would naturally serve such cargo." *Intermodal Service to Portland, Oregon*, 17 F.M.C. 106, 126 (1973). In *Council of North Atlantic Shipping Associations v. American Mail Lines, Ltd. (CONASA)*, 18 S.R.R. 774 (FMC No. 73–38, Aug. 8, 1978), however, the Commission identified certain principles

9. The ALJ apparently considered Goldsboro, North Carolina, located much closer to Wilmington than to Norfolk, in his decision. The record demonstrates that the Commission correctly eliminated Goldsboro from consideration because the tobacco market in that city had closed. Commission Decision, 19 S.R.R. at 523

n.7, J.A. 152a; Hearing Transcript, vol. III, 328 (Sept. 26, 1978).

10. These two centers are Kinston and Smithfield, North Carolina. Exhibit 10, J.A. 104a.

11. *See* note 1 *supra*.

governing cases of cargo diversion and minibridge movements.[12]

1. Certain cargo may be naturally tributary to a port, but any "naturally tributary zone" surrounding a port is constantly changing. In a particular case, this zone is determined by consideration of: (a) the flow of traffic through the port prior to the conduct in question, including points of cargo origin or destination; (b) relevant inland transportation rates; (c) natural or geographical transportation patterns and efficiencies; and (d) shipper needs and cargo characteristics.

2. A carrier or port may not *unreasonably* divert cargo which is naturally tributary to another port. When diversion of naturally tributary cargo occurs, the reasonableness of the practice must be determined. The reasonableness of the particular practice is determined by consideration of: (a) the quantity and quality of cargo being diverted (is there substantial injury?); (b) the cost to the carrier of providing direct service to the port; (c) any operational difficulties or other transportation factors that bear upon the carrier's ability to provide direct service (e. g., lack of cargo volume, inadequate facilities); (d) the competitive conditions existing in the trade; and (e) the fairness of the diversionary method or methods employed (e. g., absorption, solicitation).

*Id.* at 779 (footnote omitted). The Commission stated that these guidelines would be considered in all future proceedings in which violations of sections 16 and 17 based upon cargo diversion were alleged. In a subsequent opinion the Commission made clear that the *CONASA* guidelines applied not only to large diversions such as minibridge movements but also to "small diver-

sions" involving adjacent ports. *Pacific Westbound Conference—Equalization Rules and Practices*, 19 S.R.R. 133, 136 n.5 (FMC No. 78–32, March 30, 1979).

In this case Dart argues that the Commission ignored these guidelines in arriving at its conclusion that Dart's tariff would divert cargo naturally tributary to the port of Wilmington; Dart claims further that the Commission's decision was arbitrary, capricious, and not supported by the evidence of record.[13] We therefore turn to our analysis of the Commission's decision.

## II. DISCUSSION

### A. *Standard of Review*

■ Before examining the Commission's decision, however, we must emphasize the standard of review governing our scrutiny. The function of an appellate court in a case such as this is limited to determining whether substantial evidence exists to support the Commission's determinations. *Transamerican Trailer Transport, Inc. v. FMC*, 492 F.2d 617, 630–31 (D.C.Cir.1974). In other words, we examine the record in order to ascertain whether it "contains data sufficient to support" the Commission's conclusion. *United States v. FMC*, 636 F.2d 792 at 821 (D.C.Cir.1980): Furthermore, our principal concern is with the decision of the administrative agency in which final decisionmaking authority has been vested. As this court stated in another case in which an administrative body disagreed with the findings made in an initial decision, however, those initial findings are not immaterial. Rather,

they are part of the administrative record and may detract appreciably from contrary findings of the ultimate agency ar-

---

12. One example of a minibridge operation, in which some portion of port-to-port carriage is replaced with overland domestic carriage, is provided in *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175 (5th Cir. 1975). There the minibridge operator shipped containerized cargo from the midwest and Texas to Charleston, South Carolina by rail, where it was transshipped for ocean transport to Europe at a savings of time over the alternative all-water route. *Id.* at 177.

*See generally* Note, *Challenges to the Legality of Minibridge Transportation Systems*, 1978 Duke L.J. 1233, 1237.

13. *Amici curiae* have summarily urged that the *CONASA* guidelines are not within the Commission's statutory authority. Such a contention has not been briefed or argued by the parties and we therefore intimate no view on its merits.

biter. But the existence of substantial evidence favoring the examiner's decision does not inexorably imply the absence of substantial support for the conflicting position. And when the agency's final determination is adequately substantiated, that decision must prevail notwithstanding the defensibility of the examiner's opposite view.

*Williams v. Bell,* 587 F.2d 1240, 1246–47 (D.C.Cir.1978) (footnotes omitted). *See also National Association of Recycling Industries, Inc. v. FMC,* No. 79–1267, slip op. at 16 (D.C. Cir. Dec. 24, 1980).

B. *Application of the* CONASA *Guidelines*

■ We note initially that Dart's allegation that the Commission ignored its own guidelines as set forth in *CONASA* and *Seatrain* is without foundation. On the contrary, the Commission explicitly recognized that "the cargo diversion *standards* developed in its minibridge decisions are applicable to local port equalization practices as well as equalization effecting [sic] ports in distant port ranges." *Commission Decision,* 19 S.R.R. at 525, J.A. 154a. As long as substantial evidence supports the Commission's exercise of reasoned decisionmaking, we refuse Dart's invitation to prescribe the form and manner of Commission opinions.

■ Dart's proposed action under its tariff falls under the general rubric of "port equalization." The Commission has defined this practice as

the allowance or absorption by the ocean carrier of such amount as will make the shipper's cost of overland transportation identical, or substantially so, from his inland point of origin to any one of two or more ports. Its purpose is to enable the ocean carrier to compete for cargo with-

out calling at the port closest to, or enjoying the lowest inland transportation costs from, the point where the cargo originates.

*SACL,* 9 F.M.C. at 344. Port equalization is not unlawful in principle. Over the years, however, the guidelines and standards under which the Commission adjudged the legality of specific equalization practices varied widely.[14] By 1966 the Commission held that port equalization violated section 16 of the Shipping Act if the diverted cargo originated from territory naturally tributary to the port and was not justified by the lack of adequate service at the port. *Id. See also Intermodal Service to Portland, Oregon,* 17 F.M.C. 106, 128 (1973).

■ The standards announced by the Commission in its 1978 *CONASA* decision diverged rather sharply from past precedent. Although this case involved minibridge movements and was in part a response to technological advances such as containerization which encouraged intermodalism, *see generally* Note, *Challenges to the Legality of Minibridge Transportation Systems,* 1978 Duke L.J. 1233; Note, *Containerization and Intermodal Service in Ocean Shipping,* 21 Stan.L.Rev. 1077 (1969), the Commission announced that these guidelines would apply to more traditional micro-economic problems of port discrimination. *See* page 813 *supra.* Thus, by virtue of these guidelines, the complaining port has a more particularized burden of proof in establishing that the diverted cargo originated from territory naturally tributary to it, including specification of cargo origination points and inland transportation rates. If the complaining port carries this burden, the tariff proponent must then establish the reasonableness of the diversion.[15] The multitude of factors

---

14. One suggested explanation for this variance is that "[u]ntil 1966 research into the law of the Shipping Act and the other statutes the administration of which was charged to the various predecessors of the Commission was indeed a sometime thing" because of the lack of published precedent. CONASA (ALJ Decision), 17 S.R.R. at 826 n.74.

15. Dart apparently disputes this allocation of evidentiary burdens. Brief for Petitioner at 5, 10. The Commission's decision seems to reflect such an allocation, however, and we cannot find it to be in error. Although *CONASA* does not explicitly address this point, the Commission's opinion in that case adopted the initial decision which did set out such an alloca-

in this determination of reasonableness represents a sharp divergence from past Commission precedent; here, inadequacy of port facilities is but one of several factors to be considered.

Dart vigorously challenges the Commission's finding that Dart's tariff would divert unmanufactured tobacco that is naturally tributary to the port of Wilmington. To that end Dart relies heavily upon the findings of the ALJ who came to the opposite conclusion. Close scrutiny of these findings reveals that such reliance is misplaced, however, because, as the Commission apparently determined, the ALJ's discussion of the naturally tributary concept was not focused upon the relevant factors. At one point the ALJ stated that the record clearly established that "tobacco, as an export commodity in United States trade, has actually moved through North Carolina and Virginia ports (and, to a lesser degree, other ports) and has shown no preference whatsoever and is not tributary to any port." *ALJ Decision*, 18 S.R.R. at 1518, J.A. 145a. The focus should not be upon export tobacco in the general sense but rather upon the movement of tobacco from specific points of origin to the port of Wilmington. As the Commission stated, what is significant is whether "legitimate transportation factors consistently direct an identifiable quantity of cargo from identifiable points of origin to the Port of Wilmington." *Commission Decision*, 19 S.R.R. at 525, J.A. 154a.[16]

Certainly some of the transportation factors identified by the Ports Authority did not advance their case. For example, Henderson, North Carolina was identified by both the Ports Authority and Dart's sales representative as a major tobacco supply center. The trucking concerns quoted identical ranges of rates for shipping containerized tobacco from Henderson to the ports of Norfolk and Wilmington, from a low of $184 per container to a high of $240. Furthermore, Henderson is twenty-one miles closer to Norfolk than to Wilmington. Exhibit 11, J.A. 157a. Even crediting the ALJ's finding that intangible factors such as the personal relationships between shippers and carrier solicitors play a part in a shipper's decision, *ALJ Decision*, 18 S.R.R. at 1512, J.A. 139a, it would be difficult, viewing Henderson in isolation, to see this unmanufactured tobacco as tributary only to Wilmington and not to Norfolk as well.

On the other hand, Kinston and Smithfield, North Carolina, identified by Dart's sales representative as two of the seven major supply centers, are sixty-six and fifty-one miles closer, respectively, to Wilmington than to Norfolk. Exhibit 11, J.A. 157a. Furthermore, the lowest quoted shipping rate between these centers and Norfolk was higher than the *highest* rate quoted for carriage between these centers and Wilmington. Exhibit 10, J.A. 104a. Even allowing for "intangible" factors, of which, according to one witness, "state loyalty" might be one, Hearing Transcript, vol. I, 179 (Aug. 29, 1978), this evidence of legitimate transportation factors documents the natural movement of unmanufactured tobacco from these centers to the port of Wilmington.[17] Putting it simply, the ques-

---

tion. CONASA (ALJ Decision), 17 S.R.R. 781, 832–33.

16. Dart argues that the absence of evidence demonstrating the actual volume of tobacco emanating from specific points of origin destroys the Ports Authority's case. On these facts, however, where there was no disagreement as to the location of the "major supply centers," *see* pages 811–812 *supra*, we do not believe that such an omission is fatal. Moreover, Dart's own witness, a representative of the Virginia Port Authority, stated that such information was simply not available. Hearing Transcript, vol. III, 316–17 (Sept. 26, 1978).

17. Dart argues that the absence of actual inland truck rates is fatal to the Ports Authority's case and therefore the Commission's decision. Initially, we disagree with the Commission's contention that the rate quotations placed into the record constituted the best available evidence because no evidence existed of rates actually paid for cargo movements. The Ports Authority could have placed evidence, written or testimonial, of such shipments in the record. Dart has not suggested, however, that these quotations fail to represent close approximations of the actual carriage charges. On the facts of this case, therefore, we believe that the Commission's acceptance of rate quotations from five trucking concerns as valid evidence

tion before this court is whether there was substantial evidence to support a finding that Dart's tariff would unreasonably divert cargo naturally tributary to Wilmington, not whether *all* of the cargo to be diverted would fall into that category.

Although the Commission did not address directly the ALJ's finding that on a historical basis tobacco cargo was naturally tributary to Norfolk, noting only that tobacco has moved through Wilmington in consistent quantities since 1972, *Commission Decision*, 19 S.R.R. at 526 n.18, J.A. 155a, the ALJ misapplied the criteria set forth in *CONASA* on this point. The Commission had emphasized in that opinion that a port's locally tributary zone would vary over time. *CONASA* 18 S.R.R. at 779 n.11. The ALJ therefore erred by focusing upon the movement of export tobacco prior to the institution of container service at Wilmington in 1972. In 1971, Wilmington exported twelve thousand tons of unmanufactured tobacco to Hampton Roads's one hundred and sixty-nine thousand and Morehead City's sixty-six thousand tons. In 1972, however, Wilmington's exports increased by more than four hundred percent to sixty-three thousand tons while Hampton Roads's increased to one hundred and seventy-three thousand and Morehead City's increased to eighty-two thousand tons. Exhibit 26, J.A. 123a. Substantial record evidence supports the ALJ's finding of fact that export tobacco destined for Europe that had moved breakbulk through Morehead City shifted in 1972 to Wilmington.[18] The ALJ's further finding of fact that a shift in cargo movement also took place in 1972 from Norfolk to Wilmington, "helped by cheap overland rates by reason of nearness of supply points to Wilmington," *ALJ Decision*, 18 S.R.R. at 1505, J.A. 132a, provides strong support for the Commission's final conclusion that transportation factors identify certain cargo as naturally tributary to Wilmington.[19] We find, therefore, that this record "contains data sufficient to support an informed conclusion." *United States v. FMC*, 636 F.2d 792 at 807 (D.C.Cir.1980).

█ Dart can point to no precedent, either judicial or administrative, to support its contention that the Commission's holding is in error. On the contrary, this decision is consistent with past Commission action involving equalization practices among nearby ports. In *Stockton Port District v. Pacific Westbound Conference*, 9 F.M.C. 12 (1965), *aff'd sub nom. per curiam Stockton Port District v. FMC*, 369 F.2d 380 (9th Cir. 1966), *cert. denied*, 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967), equalization was allowed because the Commission agreed with the Examiner's conclusion that the ports of Stockton and San Francisco did not represent separate and distinct geographical areas but were rather both "bay area" ports. Here Hampton Roads, Virginia, and Wilmington, North Carolina, separated by more than two hundred miles, clearly serve distinct geographical areas. *See also Beaumont Port Commission v. Seatrain Lines, Inc.*, 2 U.S.M.C. 699 (1943) (equalization allowed between Texas City and Houston and Galveston, Galveston Bay ports, but not between Texas City and Beaumont, the latter port having access to the gulf several miles east of the Galveston

---

of "relevant inland transportation rates" was neither arbitrary nor capricious.

18. ALJ Decision, 18 S.R.R. at 1505, J.A. 132a. This factual finding was based in part upon informed speculation as to the explanation for the dramatic jump in the export of unmanufactured tobacco in 1972. As the ALJ pointed out at one of the hearings, the statistics themselves do not provide any answers because each port's exports increased in 1972 over 1971, albeit Wilmington's much more dramatically. Hearing Transcript, vol. III, 302–03 (Sept. 26, 1978). The only plausible explanation offered at the administrative hearings was that 1972

was a year in which the Japanese government monopoly made significant purchases of tobacco that moved through Morehead City. *Id.*, vol. I, 119–21 (Aug. 29, 1978).

19. The record fails to support, however, the ALJ's finding of fact that the tobacco moving through Wilmington from major supply points in North Carolina originally moved through Norfolk. ALJ Decision, 18 S.R.R. at 1505, J.A. 132a. In fact, the ALJ's own finding, supported by the record, that export tobacco destined for Europe shifted from Morehead City to Wilmington in 1972 directly contradicts this later finding.

Bay ports). As the Commission observed, past port equalization cases remain a valid reflection of Commission policy to protect ports from the diversion of local cargo. "The actual holdings of the minibridge cases [*CONASA* and *Seatrain*] are not precedent for overland cost absorptions intended to attract cargo tributary from *nearby ports* with adequate facilities for handling such cargo." *Commission Decision*, 19 S.R.R. at 525 n.16, J.A. 154a (emphasis in original).

■ Dart focused its attack almost exclusively upon the Commission's basic conclusion that certain unmanufactured tobacco cargo is naturally tributary to the port of Wilmington. Part of this attack centered upon the Commission's discussion of the precise diversionary method employed by Dart.[20] The Commission discussed the "inefficiency" of this method under the criteria for determining whether the cargo was naturally tributary. *Commission Decision*, 19 S.R.R. at 526, J.A. 155a. It would make more sense, however, to consider the efficiency of a given diversionary method when judging the "reasonableness" of the practice. We suggest, therefore, that, in the future, the Commission consider arguments for or against the efficiency of a particular practice at the second level of its two-step approach, when adjudging the fairness and reasonableness of the diversionary method before it.

Once it is established that naturally tributary cargo would be diverted, the carrier then possesses the burden of demonstrating the reasonableness of the diversion. We think it clear that Dart did not carry this burden. First, we find it neither arbitrary nor capricious that the Commission interpreted its *CONASA* standards to require only the clear possibility of substantial

harm to a port rather than the actual loss of cargo; furthermore, substantial evidence supports the Commission's determination that such a possibility existed in this case. Second, Dart challenged neither the adequacy of the Wilmington port facility nor the lack of operational difficulties precluding Dart from providing direct service to the port. *ALJ Decision*, 18 S.R.R. at 1516, J.A. 143a. Third, although Dart did establish that overland service of unmanufactured tobacco would be more economical at this point in time than a direct call at the port, *id.*, Dart conceded that such economic guesswork depended upon the cargo volume available at Wilmington. Hearing Transcript, vol. III, 395 (Sept. 26, 1978). Furthermore, Dart acknowledged that it could publish a general commodity tariff allowing it to carry cargo other than tobacco. *Id.* at 394. Thus Dart's failure to introduce evidence of cargo volume or to seek such evidence from the Ports Authority weakened the force of the cost evidence Dart did introduce.

■ Finally, Dart challenges the Commission's consideration of the proposed tariff's "efficiency." As we noted above, we believe that consideration of this factor does properly lie within the purview of the guidelines announced in *CONASA*. The Commission compared the proposed service in this case with the "natural transportation efficiencies" of the rail/water minibridge movement upheld in *CONASA*. Here Dart deprives Wilmington of geographic and inland rate advantages by "backhauling" cargo to Norfolk, an action which does not move the cargo appreciably closer to its European destination.[21] We believe that the Commission did not act arbitrarily in concluding that "[i]n this era of inflation and dwindling fuel resources,

---

**20.** Dart would effectuate its proposed equalization through the method known as "transshipment." The Commission has defined transshipment as

the movement of cargo, usually by land carrier, in the water carrier's name and at its expense, from a dock or terminal at the port where it is originally delivered by the shipper to the water carrier, to the dock or terminal

at another port where it is loaded aboard a vessel of the water carrier.

SACL, 9 F.M.C. at 345.

**21.** The Commission also noted that Dart's proposed tariff would result in "subsidization" of the transportation costs of those shippers shipping to Dart at Wilmington by those shippers shipping directly to Dart at Norfolk.

shippers, carriers and the commerce of the United States are best served by competition which increases productivity rather than competition based upon artificial shipper inducements." *Commission Decision*, 19 S.R.R. at 526, J.A. 155a.

### III. CONCLUSION

Dart does not challenge on this appeal the power of the Commission to protect a port from the unreasonable diversion of cargo adjudged to be naturally tributary to that port. We find that sufficient data exists in the administrative record to support the Commission's conclusion in this case, consistent with its past practice, that Dart's proposed tariff would unreasonably divert cargo naturally tributary to the port of Wilmington. The decision of the Commission is therefore

*Affirmed.*