**UNITED STATES of America, Appellee,**

v.

**Patricia OSTRANDER, Defendant–Appellant.**

**No. 1237, Docket 92–1719.**

United States Court of Appeals, Second Circuit.

Argued April 14, 1993.

Decided July 19, 1993.

28

Thomas G. Guiney, Boston, MA (Harry L. Manion III, Cooley, Manion, Moore & Jones, P.C., Boston, MA, John S. Siffert, Lankler, Siffert & Wohl, New York City, of counsel), for defendant-appellant.

Kenneth J. Vianale, Asst. U.S. Atty. for the S.D.N.Y., New York City (Roger S. Hayes, U.S. Atty. for S.D.N.Y., New York City, Paul G. Gardephe, Asst. U.S. Atty., of counsel), for appellee.

Before: VAN GRAAFEILAND and WINTER, Circuit Judges, and POLLACK, District Judge.*

* The Honorable Milton Pollack, United States District Judge for the Southern District of New York, sitting by designation.

WINTER, Circuit Judge:

Patricia Ostrander was charged with two counts of accepting unlawful "compensation" or a "thing of value" from a source other than her employer in connection with the performance of her duties as a portfolio manager, see 15 U.S.C. § 80a–17(e), 18 U.S.C. § 1954, and one count of failing to report a personal investment to her employer, see 15 U.S.C. § 80a–17(j), 17 C.F.R. § 270.17j–1. After an eight-day trial, the jury convicted Ostrander on all three counts. Judge Owen sentenced her to concurrent terms of two months' imprisonment. We affirm.

## BACKGROUND

Most of the pertinent events occurred during 1985 and 1986. When all permissible inferences are drawn in favor of the government, the evidence showed the following. Ostrander was a portfolio manager for Fidelity Management Research and Fidelity Management Trust Company (collectively "Fidelity"), investment advisors registered with the Securities and Exchange Commission, from 1970 to 1987. As a manager of Fidelity's funds, Ostrander purchased hundreds of millions of dollars worth of securities from Drexel Burnham Lambert, Inc. ("Drexel").

During early 1985, Kohlberg Kravis Roberts & Co. ("KKR"), a firm specializing in leveraged-buyouts ("LBOs"), decided upon an LBO of Storer Communications, Inc. ("Storer"). KKR hired Drexel to underwrite the securities for the financial transactions. The publicly offered securities included zero coupon bonds, debenture bonds paying fifteen percent per annum, and preferred stock. The preferred stock "paid-in-kind", meaning that it paid dividends of preferred stock rather than cash. It was the most junior of the securities and the most difficult of the securities to sell.

In addition to these publicly offered securities, 67,840,000 warrants were created. Their holders were entitled to exchange each warrant for one share of common stock in the Storer holding company at an exercise price of $2.05. The warrants represented thirty-two percent of the Storer holding company's common stock. They were described as "equity sweeteners" or "equity kickers" because they were designed to assist in the sale of the debentures and preferred stock. Drexel thus told KKR that they would be offered for private sale only to those institutions who had purchased zero coupon bonds, debentures, or preferred stock. This intent also was stated in the prospectus. Thereafter, the head of Drexel's High Yield Bond Department, Michael Milken, falsely indicated to KKR that the warrant price was too high and that potential bond or stock purchasers were "balking" at a price of fourteen cents per warrant. The warrants then were sold for seven cents each and offered only to a few select investors, including Drexel employees. Many of these Drexel employees kept the warrants in partnerships, one of which was MacPherson Investment Partners L.P.

On behalf of Fidelity, Ostrander attended a Drexel roadshow on October 28, 1985. She agreed to purchase for Fidelity Storer securities issued pursuant to the LBO. On December 5, 1985, KKR executed the Storer LBO. On behalf of Fidelity, Ostrander purchased $10 million of the zero coupon bonds, $26 million of the preferred stock (ten percent of the preferred stock offering), and $59 million of the fifteen percent senior subordinated debentures.

During late December 1985, Drexel's Michael Milken offered Ostrander the opportunity to invest her personal funds in MacPherson Investment Partners L.P., a partnership holding some of the Storer warrants. She was not alone. Sixty-five percent of MacPherson was owned by fiduciaries for institutions that purchased other securities issued in the Storer LBO. Ostrander invested $13,200 in MacPherson (paying approximately nine cents per warrant) during January 1986. When purchased, the warrants were highly speculative, and no witnesses were able to value them even as of late December 1985. KKR sold Storer's stations and cable systems at the top of the market in 1987 and 1988 and realized a profit that surpassed prior expectations. The value of Ostrander's $13,200 investment grew to roughly $750,000.

On October 11, 1991, Ostrander was indicted on three counts. Count One charged her

with accepting unlawful compensation in connection with her purchases or sales of securities for registered investment companies that she managed as an affiliated person in violation of 15 U.S.C. § 80a–17(e). Because the funds she managed for Fidelity Management Trust Company ("FMTC") were primarily pension plans, Count Two charged that she, acting as "an officer, agent, or employee" of FMTC received "things of value" in connection with purchases of securities for pension plans in violation of 18 U.S.C. § 1954. The third count charged that Ostrander, an access person, failed to report the securities at issue to her employer, a registered investment advisory company, as required by 15 U.S.C. § 80a–17(j) and 17 C.F.R. § 270.17j–1(c).

The jury convicted her on all counts. Judge Owen sentenced Ostrander to concurrent terms of two months' imprisonment and to a $100,000 fine.

## DISCUSSION

On appeal, Ostrander challenges the convictions on four grounds: (1) an erroneous jury charge stating that the opportunity to purchase the warrants was "a thing of value" even though the actual value of the warrants was not proven, (2) insufficient evidence, (3) erroneous evidentiary rulings, and (4) a claim that Count Three does not allege a crime.

Section 17(e) of the Investment Companies Act makes it unlawful for an "affiliated person" of a registered investment company, acting as its agent, to accept "from any source any compensation (other than a regular salary or wages from such registered company) for the purchase or sale" of property, including securities, by such investment company. 15 U.S.C. § 80a–17(e). Section 1954 of Title 18 prohibits administrators, officers, and employees of employee welfare benefit plans or employee pension benefit plans from receiving "any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of [her] actions, decisions, or other duties relating to" the plan. 18 U.S.C. § 1954.

Ostrander challenges the trial court's instruction that the "opportunity" to purchase the warrants might constitute a violation of Section 17(e) and Section 1954 even though there was no proof that the warrants were purchased at a price below their market value. The challenged instruction is set out in full in the margin.[1]

█ Specifically, Ostrander argues that Counts One and Two require proof of receipt of "compensation" or a "thing of value" for a price less than its market value. She argues that the judge charged on a faulty legal theory in stating that "you [jurors] need not concern yourself with finding [the warrants'] precise value in the marketplace." We disagree.

In *United States v. Deutsch,* 451 F.2d 98 (2d Cir.1971), *cert. denied,* 404 U.S. 1019, 92

1. The challenged instruction stated:
   Compensation is anything of benefit or anything of value, whether directly or indirectly received. It may take several forms and is not limited to money or tangible things with an identifiable commercial price tag.
   To prove that compensation was received the government must prove that what Mrs. Ostrander received constituted something of value at the time she received it. You need not concern yourselves with finding a precise value in the marketplace. But you may look to the value the recipient here, Mrs. Ostrander, placed on the thing at the time she received it. In other words, the value of something can well be judged and set by the desire of that recipient to have the thing and depends upon that individual and all the circumstances surrounding its receipt.
   On this issue you may consider whether or not the defendant herself attached a value to

the opportunity to purchase MacPherson and, if she did, whether the value she placed on it was materially above the price being asked to pay for it. Here the defendant contends that MacPherson ... had all of the attendant risks and therefore was not a thing of value as defined. The government, on the other hand, contends that the mere opportunity to invest in MacPherson was itself compensation or a thing of value because the MacPherson interests were by their nature scarce or available to only a few individuals....
   It is sufficient that the government prove that the compensation at issue here, namely, the opportunity to invest in MacPherson, was connected to the sale of securities to the funds she managed or, in other words, that it was given and received by her in appreciation of past or in anticipation of future conduct by her.

S.Ct. 682, 30 L.Ed.2d 667, (1972), the case upon which Ostrander primarily relies, we upheld a trial court's definition of the term compensation as a "benefit or thing of value [including] being granted an opportunity to purchase securities at a discounted price." *Id.* at 114. Our holding that this kind of benefit was included among "things of value" did not limit that definition to securities sold at a discount. In fact, the panel stated that the instructions "were more favorable" to Deutsch than necessary. *Id.* at 115. "He was entitled to an instruction merely that the jury could not convict without being persuaded beyond a reasonable doubt that the agreement to buy [the note] was made with the knowledge that it constituted something of value." *Id.*

Nor do other cases require that the "thing of value" received be shown to have been transferred at a discount somehow calculated. In *United States v. Williams,* 705 F.2d 603 (2d Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983), we upheld an instruction that the jury should disregard the stock's "worth in the commercial world." *Id.* at 623; *see also United States v. Crozier,* 987 F.2d 893, 901–02 (2d Cir.1993); *United States v. Blitz,* 533 F.2d 1329, 1344, 1345 (2d Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976) (construing "thing of value" under Section 17(e) of the Investment Companies Act to include loans repaid with interest); *United States v. Roth,* 333 F.2d 450, 453 (2d Cir.1964) (upholding instruction that jury must "find more than a loan [and] substantial monetary benefit or thing of value" because, "if anything, [it was] *too favorable* to defendants") (emphasis added), *cert. denied,* 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961 (1965).

These decisions take a common-sense view of Section 17(e) and Section 1954. Under these statutes, it is enough if the item received was regarded as a benefit by the recipient, whether or not others might have taken a different view of its value. Based on the evidence before it, the jury could reasonably conclude that Ostrander regarded the opportunity to purchase the warrants as a benefit. This opportunity was carefully limited by Milken to selected persons, including himself, other Drexel employees, firms, and fiduciaries for institutions that had purchased securities in the Storer LBO. There was no market price set by public trading in which all were free to engage, and the opportunity to purchase the warrants was at Milken's whim and at a price set by him. Ostrander's claim that the legal theory underlying her conviction would criminalize transactions in heavily traded securities at open market prices is simply wrong. Such transactions are not benefits within the meaning of the statutes because the purchaser obtains nothing unavailable elsewhere at the same price. Such a transaction cannot influence a fiduciary's decisionmaking. Although Ostrander got no guarantee of profit, she did get an opportunity offered only to a few that she clearly believed to be a good buy. That is a thing of value, or so a jury might find.

██ Without irony, she also contends that the warrants had no value and that the judge erred by instructing the jury to "look to the value [she] placed on the thing at the time she received it." We disagree. First, the warrants had value, if for no other reason because numerous investment professionals, including Drexel employees and fiduciaries for investors, were willing to, and did, purchase them. *See Williams,* 705 F.2d at 623. Indeed, the "they-had-no-value" argument rings particularly hollow from one who actually paid value and then made a profit of nearly $750,000 on an investment of $13,200. Second, the instruction was proper according to our decision in *Williams,* which upheld an instruction "to focus on the value that the defendants subjectively attached to the items received." *Id.*

The jury might easily have found that the warrants were compensation for her past and future purchases of securities from Drexel for Fidelity. She had purchased on behalf of Fidelity large blocs of the securities offered in the LBO, including ten percent of the preferred, the most difficult securities of the package to sell. We are unpersuaded by her argument that, because she purchased no Storer bonds after agreeing to buy the warrants, the jury could not as a matter of law find a connection to her purchase of the Storer securities or to potential future pur-

chases from Drexel of securities in other companies.[2]

[█] Ostrander also challenges the admission of evidence concerning two conversations that purportedly are inadmissible hearsay. The first conversation occurred between Michael Milken and Ted Ammon, a general partner from KKR. During the telephone conversation, Milken told Ammon that potential bond or preferred stock buyers were "balking" because the warrants were too expensive. This conversation induced Ammon to agree to reduce the initial offering price for the warrants from fourteen to seven cents. Because this evidence was not offered by the government to prove the truth of its contents, it was not hearsay. *See* Fed. R.Evid. 801(c). The evidence was intended to show that Milken had made such statements and persuaded KKR to authorize a drop in price, not that the contents of the statements were true. Indeed, Milken's statements were false and were offered to show only that he successfully induced Storer to reduce the price and, by implication, that he believed the warrants, which he intended to appropriate for himself, co-workers and other selected purchasers, were of value.

[█] Craig Cogut, a witness, testified about the second conversation. He stated that he had overheard Michael Milken's brother Lowell tell Milken "words to the effect that you better get moving selling the preferred or we are going to be long a whole lot of it," a statement with which Michael did not disagree. This statement reflected the state of mind of each brother that the preferred was a hard sell, *see* Fed.R.Evid. 803(3), a fact that was relevant to their motive to pay compensation to Ostrander.

[█] Finally, Ostrander argues that Count III does not allege a crime. Count III charged that she had violated 15 U.S.C. § 80a–17(j) and 17 C.F.R. § 270.17j–1 by failing to report her MacPherson investment

to Fidelity. Section 17(j) of the Investment Companies Act states in pertinent part:

> It shall be unlawful [for a person in Ostrander's position] to engage in any act, practice, or course of business in connection with the purchase or sale, directly or indirectly, by such person of any security held or to be acquired by such registered investment company in contravention of such rules and regulations as the Commission may adopt to define, and prescribe means reasonably necessary to prevent, such acts, practices, or courses of business as are fraudulent, deceptive or manipulative.

Title 17 C.F.R. § 270.17j–1(c)(1), promulgated pursuant to Section 17(j), states in pertinent part:

> Every [portfolio manager for] a registered investment company ... shall report to such investment company, ... [the date of a purchase or sale of a security, the price, and the broker] with respect to transactions in any security in which such access person has, or by reason of such transaction acquires, any direct or indirect beneficial ownership....

Both the statutory provision and the regulation may be enforced through criminal proceedings. 15 U.S.C. § 80a–49.

Ostrander does not dispute that she failed to inform Fidelity of her MacPherson investment, thus violating a company rule as well as Section 270.17j–1(c)(1). Rather, she argues that Section 17(j) applies only to securities "held or to be acquired" by Fidelity. Because Fidelity never held an interest in MacPherson, she concludes, she was under no duty to report. The argument is entirely frivolous. Any payment to a portfolio manager intended to induce the purchase of a firm's securities on behalf of an investment company easily qualifies as a "fraudulent, deceptive or manipulative" act "in connection with" the investment company's acquisition

---

2. Because we reject Ostrander's theory that the payment of a fair market value for the warrants was a defense, we need not consider her two related arguments: (i) she was deprived of presenting her defense that she did not know that the warrants may have been sold below their market value; if the law does not recognize a legal argument as a valid defense, the court has no duty to instruct the jury on that argument; (ii) the government lacked sufficient evidence that the warrants were sold below their actual value; that is not an element of the crime and thus need not be proven.

of securities, whether or not the payment consists of an opportunity to purchase securities in a different firm. Moreover, Section 17(e) expressly invites the Commission to flesh out its general prohibitions by regulation. The regulation in question, which requires portfolio managers to report to their companies their interests in various securities, is a prophylactic measure reasonably related to the enforcement of Section 17(j). *See United States v. Chestman,* 947 F.2d 551, 556–63 (2d Cir.1991). Ostrander's failure to report her interest in MacPherson was thus a crime.

Affirmed.