**UNITED STATES of America, Appellee,**

v.

**Alan E. ROSENTHAL, Defendant–Appellant.**

**No. 1244, Docket 92–1738.**

United States Court of Appeals, Second Circuit.

Argued March 31, 1993.

Decided Nov. 16, 1993.

Peter E. Fleming, Jr., New York City (Eliot Lauer, Daniel R. Lenihan, Curtis Mallet–Prevost Colt & Mosle, of counsel), for defendant-appellant.

Nelson W. Cunningham, Asst. U.S. Atty., New York City (Roger S. Hayes, U.S. Atty., for S.D.N.Y., Karen Patton Seymour, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, PIERCE, and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

Alan E. Rosenthal appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York, Louis L. Stanton, *Judge.* On November 18, 1992, after a trial by jury, Rosenthal was convicted of offering a gratuity in connection with a pension plan investment, in violation of 18 U.S.C. § 1954. He was sentenced to a one year suspended prison term and three years' probation. As a condition of probation, he was ordered to pay a fine of $250,000, and to perform three-hundred hours of community service. Additionally, the court imposed a special assessment of $50. For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

On May 9, 1991, Alan E. Rosenthal was charged with conspiracy and various substantive violations of federal law in an eleven-count indictment filed in the United States District Court for the Southern District of New York. On February 25, 1992, the Government filed an eleven count superseding indictment (the "indictment") which was identical to the original indictment in all respects relevant to this appeal. Count One of the indictment charged Rosenthal with conspiracy to commit securities, mail and wire fraud, to commit tax offenses, to offer an illegal gratuity in connection with a pension plan investment, to embezzle funds from a pension plan, and to obstruct justice. The substantive securities fraud charges were set forth in Counts Two and Nine of the indictment, and the mail fraud charges in Counts Three through Six and Count Ten. Count Seven charged Rosenthal with aiding and assisting the filing of a false tax return. Count Eight charged him with offering a gratuity in connection with a pension plan investment, and Count Eleven charged him with embezzlement from a pension plan.

Prior to trial, the Government voluntarily dismissed the mail fraud charges contained in Counts Three through Six of the indictment and, on defendant's motion, the trial court dismissed Count Two, one of the securities fraud charges. Count Seven, which charged Rosenthal with aiding and assisting the filing of a false tax return, was dismissed on defendant's motion at the close of the Government's case. The jury acquitted Rosenthal on four of the five remaining counts. The single count upon which Rosenthal was convicted, Count Eight, charged that in 1985 he "knowingly gave and offered" a "thing[ ] of value" to David Solomon, a pension fund manager, with intent to influence Solomon in his role as a pension fund manager, in violation of 18 U.S.C. § 1954.

The evidence at trial consisted of, *inter alia,* the testimony of Solomon and of Michael Milken, who was the head of Drexel Burnham Lambert's ("Drexel") High Yield Bond Department ("HYBD"). From the evidence presented, the jury could conclude that Solomon was the majority shareholder of Solomon Asset Management ("SAM"), an investment advisory company registered with the Securities and Exchange Commission ("SEC"), which Solomon founded in 1983. Solomon testified that seventy percent of the assets managed by SAM were for corporate pension funds, and SAM invested those assets primarily in high yield bonds.

SAM appears to have been an important client of Drexel's HYBD. According to Solomon, SAM's assets under management reached a peak of approximately two and one half billion dollars and the firm did fifty to seventy percent of its overall business with Drexel. Solomon, as a money manager, had

maintained a relationship with Milken since their initial meeting in 1973, and Solomon stated that he spoke with Milken by phone thirty to fifty times a day concerning business.

Solomon testified that in December 1985, he contacted Milken to request that Milken help him find a tax shelter for personal short term capital gains that he had realized in that year. According to Solomon, Milken informed him that no tax shelters were available but that he would be willing to arrange a transaction through Drexel consisting of a sale of securities by Drexel to Solomon and then a repurchase by Drexel of the securities at a lower price. This transaction would generate tax losses for Solomon for 1985 (the "1985 Tax Trades"). Solomon testified that he intended to use these losses to offset his short term capital gains for that year. Milken, Solomon stated, also promised to try to make up these 1985 losses by finding a favorable investment opportunity for Solomon in 1986.

Solomon stated that Milken directed him to "tell Alan [Rosenthal] what you need and Alan will take care of it for you." Solomon immediately called Rosenthal, who was the head of Drexel's Convertible Bond Department, and explained both his tax situation and that he was seeking to offset as much of his 1985 capital gains as possible. A few days later, Rosenthal called Solomon with the names of two securities—American Adventure and Patient Technology—that could be used to generate the desired losses. Rosenthal proposed prices and quantities and suggested that Solomon's personal broker, Arthur Dresner, contact Rosenthal to consummate the trades. Acting through Dresner, Solomon purchased the American Adventure bonds on December 2, and the Patient Technology bonds on December 4, 1985, from Drexel for a little over $4,100,000. Approximately one week later, Solomon spoke with Rosenthal concerning arrangements to have Drexel repurchase the bonds from him. Again acting through Dresner, Solomon sold the bonds back to Drexel for approximately $2,500,000, generating a loss for Solomon of about $1,600,000. Solomon claimed this loss on his 1985 federal income tax return, which reduced his federal tax liability by approximately $800,000.

Drexel trade tickets were introduced into evidence listing "Alan" or "Alan R." as the salesperson who arranged the trades involving the Patient Technology and American Adventure bonds, and who arranged the repurchase of those bonds at the lower price.

As noted, during their initial conversation in December 1985 concerning the tax trades, Milken had agreed to provide Solomon with the opportunity to recoup the 1985 losses sometime in 1986. In January of 1986, Milken offered Solomon the opportunity to purchase an interest in a limited partnership called MacPherson. MacPherson held warrants which enabled the holder to purchase, for a specified period of time and at a specified price, a designated quantity of common stock in a company called Storer Broadcasting. Milken informed Solomon that, if he purchased the interest in MacPherson and held onto it for six months, he could sell the interest back to Drexel for a profit large enough to offset the losses sustained in the 1985 Tax Trades. That same month, Solomon paid $88,000 for an interest in MacPherson. In October 1986, Solomon sold that interest to Drexel for approximately $2,200,000, yielding a personal profit to Solomon of approximately $2,100,000.

According to the testimony of Dominick Perrotta, an Internal Revenue Service agent, because Solomon held the securities for more than six months, the gains he derived were taxed at the more favorable long term capital gains rate. At the time, under the applicable provision of the tax code, only forty percent of the total gain was taxed. Thus, of the $2,100,000 gain in 1986, only $640,000 was subject to tax, and Solomon's resulting tax liability from the gain was roughly $320,000. In sum, the 1985 Tax Trades, when combined with the 1986 MacPherson transaction, resulted in a combined tax savings for Solomon of approximately $480,000.

Although both Solomon and Milken testified that Rosenthal was not directly involved in the MacPherson trades, the Government introduced documentary evidence demonstrating that Rosenthal was nevertheless aware of Solomon's expectation that the 1985

losses would be recouped later. This evidence was in the form of a balance sheet drawn up by Rosenthal on December 27, 1985, detailing Solomon's dealings with Drexel. The balance sheet contained two columns, one entitled "Solomon to DBL" and the other entitled "DBL to Solomon." The column marked "DBL to Solomon" contained the description "Losses for D.S.," with a notation corresponding to that description of "1,661,288"—the amount that Solomon had lost on the 1985 Tax Trades.

At the close of the Government's case, Rosenthal moved to dismiss, *inter alia*, Counts Seven and Eight of the indictment. He argued that Count Seven, which charged him with aiding and assisting the filing of a false tax return, should be dismissed since the Government failed to prove that Solomon's 1985 losses were fraudulent. On June 3, 1992, the trial judge dismissed Count Seven citing the insufficiency of the evidence indicating that Solomon's losses were compensated for by "insurance or its equivalent," and, therefore, fraudulent under 26 U.S.C. § 165(a). The judge reasoned that reimbursement through a promised investment opportunity in 1986 was not certain enough to qualify as insurance or other compensation.

In contrast, Judge Stanton declined to dismiss Count Eight of the indictment, which charged Rosenthal with offering an illegal gratuity in connection with a pension plan investment, in violation of 18 U.S.C. § 1954.[1] Rosenthal argued that the Government was required to prove that he gave Solomon the "thing of value" that was specified in the indictment, to wit, "false and fraudulent tax losses through the 1985 Tax Trades." Since the Government had not proven that the tax losses were "false and fraudulent," Rosenthal argued, the Government could not prove that he committed the crime with which he was charged in the indictment. Judge Stanton rejected this contention and ruled instead that the "thing of value" under § 1954 need not be itself unlawful. The judge let Count Eight stand since the "overall thrust charge[d] a violation of ERISA."

Before submitting the case to the jury, Judge Stanton provided counsel with a redacted version of the indictment that eliminated the dropped counts and removed the words "phony and unlawful" and "false and fraudulent" from all references to Solomon's losses from the 1985 Tax Trades. In addition, the redacted version deleted all tax-related objects of the conspiracy, and changed the description of the "thing of value" in Count Eight to read merely "tax losses through the 1985 Tax Trades." This redacted indictment formed the basis for the district court's jury charge and was given to the jury to assist it in its deliberations.

Following Rosenthal's conviction on Count Eight, he moved for a judgment of acquittal objecting to the redaction of that count. He argued that Count Eight had been constructively amended by the deletion of the words "false and fraudulent," with the result that he was convicted on a "theory of criminality" that was never presented to a grand jury. Judge Stanton denied the motion in a written decision dated August 5, 1992, citing, *inter alia*, this Court's decision in *United States v. Helmsley*, 941 F.2d 71, 89–93 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992). He ruled that the deletion of those terms "did not constructively amend Count Eight, because the description of the tax losses as 'false and fraudulent' was not essential to the gratuity charge." He found that the redaction did not affect the "core of criminality" of Count Eight, which was the giving of a benefit to Solomon with the expectation of receiving business from the pension plans he controlled. Judge Stan-

---

1. This section provides in pertinent part:
   Whoever being—
   (1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee ... pension benefit plan;

   .    .    .    .    .

   receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined ... or imprisoned....

ton held further that Rosenthal had received sufficient notice of the crime charged in Count Eight.

Rosenthal also argued that the evidence presented by the Government did not establish a "thing of value," as required under § 1954. According to Rosenthal, losses "cannot properly be characterized as a 'thing of value[]' [a]bsent a guaranteed profit sufficient to cover [the] loss...." He urged that "Milken's promise of an investment opportunity was no more than that, and, as this Court recognized, carried the risks of any investment which is not guaranteed." Moreover, he charged that the evidence was insufficient to convict him, even if one assumed that the 1985 tax losses, coupled with Milken's promise, did constitute a "thing of value," because the Government failed to prove beyond a reasonable doubt that he knew about Milken's promise to make Solomon whole in 1986.

Judge Stanton rejected both of these contentions and concluded that there was "sufficient evidence to support the jury's determination that the 1985 Tax Trades were a 'thing of value,' and that Rosenthal knew that he was giving a 'thing of value' to Solomon." He noted that "both Messrs. Solomon and Milken believed at the time that the transactions were 'of value' to Solomon, and it is not necessary to show (although there can be little doubt on the point) that Rosenthal knew why they thought so, as long as he knew that Solomon regarded the Tax Trades as desirable and that Milken wanted Rosenthal to arrange them to keep Solomon's funds' business." Finally, Judge Stanton concluded that there was "sufficient evidence to support the jury's determination that Rosenthal participated in the 1985 Tax Trades in order to accommodate ... Solomon...." The evidence, the judge stated, revealed that Milken wanted Solomon to do more business with Drexel and that Solomon controlled pension funds worth about $2 billion. This evidence, he observed, provided a sufficient basis for the jury to conclude that "Milken and Rosenthal engaged in the transaction in order to remain in Solomon's favor so that Solomon would give their department of Drexel more of his pension fund business."

Rosenthal was sentenced by the district judge to a one year suspended prison term, three years' probation, a fine of $250,000 and a special assessment of $50. In addition, he was ordered to perform three-hundred hours of community service. This appeal followed.

## DISCUSSION

On appeal, Rosenthal reiterates the arguments he made before the district court in his post-trial motion for a judgment of acquittal on Count Eight. Rosenthal contends that the district court's alleged amendment of Count Eight violated his fifth amendment rights. Secondly, he asserts that he did not give a "thing of value" to Solomon within any fair reading of 18 U.S.C. § 1954. Further, he contends that there was no evidence that he acted "because of or with the intent to influence" Solomon's conduct as a pension fund manager.

In response, the Government argues that the terms "false and fraudulent" in Count Eight of the indictment were mere surplusage, and, therefore, their deletion did not violate Rosenthal's right to indictment by a grand jury. The Government also maintains that the 1985 Tax Trades yielded a tax benefit to Solomon that was a "thing of value" within the meaning of § 1954 and that there was sufficient evidence for a jury to conclude that Rosenthal conferred this benefit with intent to influence Solomon's behavior as a pension fund manager.

## I. Rosenthal's Right to Indictment by Grand Jury

Count Eight of the indictment, prior to redaction by the district court, provided:

36. From in or around December 1985 through in or around October 1986 ... the defendant ALAN E. ROSENTHAL ... unlawfully, willfully and knowingly gave and offered and promised to give and offer, directly and indirectly, fees, kickbacks, commissions, gifts, loans, money and things of value, to officers, counsel, agents and employees of an organization which provided benefit plan services to, and to agents, counsel, and custodians of, employee pension and welfare benefit plans which

were subject to title [sic] I of the Employee Retirement Income Security Act because of or with intent to influence their actions, decisions, and other duties related to questions and matters concerning such plans, namely, false and fraudulent tax losses through the 1985 Tax Trades, to David B. Solomon in connection with the investment by him of monies on behalf of employee pension and welfare benefit plans that were clients of SAM.

(Title 18, United States Code, Section 1954 and 2).

As noted above, before charging the jury, the district court deleted the words "false and fraudulent" from the count. Rosenthal contends that because the indictment departed from the statutory language of § 1954 and undertook to define and specify an essential element of the offense, to wit, the "thing of value," that specification became a part of the charging terms of the offense and had to be proved by the Government. According to Rosenthal, the district court deleted the words "false and fraudulent" from the indictment because the Government failed to prove that Solomon's 1985 losses were fraudulent, and, thus, the charging terms of Count Eight were altered and an impermissible amendment occurred. We are not persuaded that the indictment herein was impermissibly amended. Even if it were appellant's contention that there was a variance between the pleading and proof at trial, he would not prevail on that claim since he would have to show that he suffered prejudice, *see United States v. Weiss*, 752 F.2d 777, 787 (2d Cir.) (claim of variance is "subject to the harmless error rule and require[s] a showing of prejudice to the defendant"), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). Appellant stated in his reply brief, at page 7, that "[t]he issue is not whether [his] defense was prejudiced by the redaction of Count Eight, but whether that redaction altered the 'charging terms' of Count Eight before it was given to the jury." We focus our discussion, therefore, on whether the subject count was constructively amended.[2]

■ An indictment is constructively amended when the proof at trial differs from that which was charged in the indictment. *See United States v. Patino*, 962 F.2d 263, 265 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 354, 121 L.Ed.2d 268 (1992). A variation between the charges in the indictment and the evidence at trial that "broadens the basis of conviction beyond that charged in the indictment," is an impermissible constructive amendment. *Id.* at 265 (citing *United States v. Miller*, 471 U.S. 130, 144–45, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985)). For example, in *Stirone v. United States*, the appellant was charged with violating the Hobbs Act, 18 U.S.C. § 1951. *See* 361 U.S. 212, 213, 80 S.Ct. 270, 271, 4 L.Ed.2d 252 (1960). The indictment charged interference with interstate shipments of sand to Pennsylvania, *id.* at 214, 80 S.Ct. at 271, but the proof at trial was broadened to include shipments of steel out of Pennsylvania. *Id.* This was found to be an impermissible broadening of the indictment. *Id.* at 219, 80 S.Ct. at 274.

It is well settled that a "[c]onstructive amendment of an indictment is a *per se* violation of the grand jury clause of the Fifth Amendment." *Patino*, 962 F.2d at 265–66.[3] If such an amendment occurs without resubmission to the grand jury, the "[d]eprivation of such a basic right is far too serious to be ... dismissed as harmless error." *Stirone*, 361 U.S. at 217, 80 S.Ct. at 273 (citation omitted). We have stated previously, however, that the challenged alteration "must affect an essential element of the offense," *Patino*, 962 F.2d at 266 (citing *Weiss*, 752 F.2d at 787), "and we have 'consistently permitted significant flexibility in proof, provided that the defendant was given notice of the

---

2. The redaction of Count Eight of the indictment, to bring it into conformity with the proof at trial, might properly be considered an actual amendment, rather than a constructive amendment. In our view, the analysis of Rosenthal's claim would not be altered by this distinction, since any amendment, "either literal[ ] or in effect," is prohibited by the fifth amendment. *See Weiss,* 752

F.2d at 787 (citation and internal quotation marks omitted).

3. The fifth amendment to the United States Constitution provides, in pertinent part:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury....

"core of criminality" to be proven at trial.'" *Id.* (citing *United States v. Heimann,* 705 F.2d 662, 666 (2d Cir.1983)) (other citations omitted).

█ Rosenthal relies upon a number of constructive amendment cases to support his contention that the deletion of the words "false and fraudulent" from Count Eight violated the fifth amendment. We are not persuaded that the trial judge impermissibly amended Count Eight and thus improperly broadened the basis for conviction on that count. We believe that Rosenthal was adequately apprised of the "core of criminality"—the essential elements—of the § 1954 charge, to wit, that he gave a "thing of value" to one of the enumerated fiduciaries with intent to influence that individual's actions or decisions concerning an employee welfare benefit or pension benefit plan.

In each of the cases Rosenthal cites, the defendant was convicted on proof of transactions different from those identified in the indictment. For example, in *United States v. Weissman,* 899 F.2d 1111 (11th Cir.1990), a RICO indictment charged that the "enterprise" was a "'group of individuals associated in fact known as the DeCavalcante Family of La Cosa Nostra.'" *Id.* at 1112. During jury deliberations, the jury asked, "'Are enterprise and DeCavalcante Family synonymous?'" *Id.* at 1113. The district judge instructed the jury in response that they were not, and that the jury could convict the defendants if it found that any enterprise existed, even if it was not the DeCavalcante Family. *Id.* The Eleventh Circuit reversed because under the judge's supplementary instruction, "the jury may well have convicted these defendants of being involved with an enterprise other than the one charged in the indictment." *Id.* at 1116. To the same effect is *United States v. Zingaro,* 858 F.2d 94 (2d Cir.1988). *Zingaro* involved, *inter alia,* a series of unlawful gambling debt collections at various Yonkers social clubs. *Id.* at 97. At trial, the Government introduced proof of the unlawful collection of a debt that was not mentioned in the indictment and that was unrelated to the activities of the identified social clubs. *Id.* We found that this amounted to a constructive amendment of

the indictment because this uncharged collection of a debt "fell entirely outside the criminal 'scheme' alleged" in the indictment, and the defendant had no "inkling" that he was charged with this criminal act. *Id.* at 103. The danger, in all of these cases, was that the defendant could have been convicted for conduct entirely different from that charged in the indictment.

In contrast, Rosenthal seems merely to fault the Government for alleging in the indictment more than was necessary to charge him with a violation of § 1954. In *Miller,* the Supreme Court distinguished *Stirone* from the case where, as here, "the offense proved was fully contained within the indictment." 471 U.S. at 137, 105 S.Ct. at 1816. The Court held that the grand jury clause of the fifth amendment was not violated when the defendant's complaint was "not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary." *Id.* at 140, 105 S.Ct. at 1817. Relying upon *Miller,* this Court rejected the proposition that "'it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it.'" *Helmsley,* 941 F.2d at 92 (quoting *Miller,* 471 U.S. at 144, 105 S.Ct. at 1819).

We also said as much in *United States v. Sindona,* 636 F.2d 792 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), wherein the appellant raised a claim similar to the one now raised by Rosenthal, and which was based upon a similar set of facts. In *Sindona,* the indictment charged the defendant with unlawfully failing to disclose that certain monies were "fraudulently and illegally" obtained. *Id.* at 796. The court instructed the jury that it could convict even if it determined that the monies were in fact legally obtained. *Id.* On appeal, we determined that the indictment had not been constructively amended because the core of the charged scheme was wrongly concealing information relating to the source of the funds, and not whether the funds had been "fraudulently and illegally" obtained. *Id.* at 797. Similarly, the core of criminality set forth in the charged count

herein was the giving of tax benefits to Solomon with intent to influence his actions as a pension fund manager, in violation of § 1954, regardless of whether those tax benefits were fraudulent, and it is clear to us that Rosenthal had sufficient notice of the elements of the offense charged in Count Eight.

■ While it is the Government's burden to prove the essential elements of a charged crime, allegations in an indictment that go beyond the essential elements which are required for conviction do not increase the Government's burden. As is discussed in greater detail, *infra,* there was sufficient evidence for the jury to find that Rosenthal gave Solomon a "thing of value" and that he acted with the requisite intent. Such evidence was required to be offered if the Government was to obtain Rosenthal's conviction. Deletion of the words "false and fraudulent" from Count Eight did not alter an essential element of the charged offense since nothing in § 1954 requires that the "thing of value" be unlawful itself. The words did not, by their averment, become an essential element of the offense required to be proved at trial. We, therefore, affirm the district court's conclusion that Rosenthal's fifth amendment right was not violated by the deletion of the words "false and fraudulent" from Count Eight of the indictment.

## II. *"Thing of Value"*

■ Next, Rosenthal claims that he did not give Solomon a "thing of value" within the meaning of 18 U.S.C. § 1954. Rosenthal seems to assert that, absent a guarantee of reimbursement, the 1985 Tax Trades could not have constituted the "giving" of something of value to Solomon. Essentially, Rosenthal argues that "[e]ven if it could be argued that lawful tax losses have 'value' for tax purposes, it cannot be said these losses were 'given' to Solomon, when Solomon paid $1.6 million to obtain them." In response, the Government contends that there is ample evidence that Rosenthal arranged the 1985 Tax Trades with Solomon in order to reduce Solomon's personal taxable income in 1985, and that Rosenthal knew that by arranging these trades he was giving Solomon some-

thing that he valued. We believe that the Government's position is correct.

Rosenthal questions whether lawful tax losses could be considered a "thing of value" within the meaning of § 1954. We believe there was sufficient evidence for the jury to conclude that, by arranging the 1985 Tax Trades with the knowledge that Solomon expected to recoup the resultant tax losses through later dealings with Drexel, Rosenthal did give a "thing of value" to Solomon.

Section 1954 makes it unlawful, *inter alia,* for a person to directly or indirectly give, offer, or promise to give or offer any fee, kickback, commission, gift, loan, money, or thing of value to an administrator, officer, trustee, custodian, counsel, agent or employee of any employee pension plan. We have interpreted the phrase "thing of value" to include both tangible and intangible things. *See United States v. Robilotto,* 828 F.2d 940, 947 (2d Cir.1987) (citation omitted), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988). Moreover, the "thing of value" need not be illegal itself for the transaction to violate § 1954. *See United States v. Romano,* 684 F.2d 1057, 1064 (2d Cir.) (television sets received by defendants in return for opening accounts on behalf of pension funds constituted a prohibited "thing of value"), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 376, 74 L.Ed.2d 509 (1982). The critical inquiry with respect to this element of § 1954 is whether the tax losses generated by the 1985 Tax Trades were believed to have value to Solomon, the recipient. *See United States v. Ostrander,* 999 F.2d 27, 31 (2d Cir.1993). *Cf. United States v. Williams,* 705 F.2d 603, 622–23 (2d Cir.) (worthless shares of stock nonetheless a "thing of value" under bribery statute because recipient expected shares to have substantial worth), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983). We agree with the district court that there was sufficient evidence before the jury to allow it to conclude that Rosenthal knew Solomon regarded the tax losses as valuable; such evidence includes Solomon's testimony that he told Rosenthal that he needed the tax losses to offset his 1985 capital gains. Under the circumstances of this case, we conclude that the

tax losses were a "thing of value" within the meaning of § 1954.

We are also unpersuaded by Rosenthal's argument that he did not give the tax losses to Solomon because Solomon paid $1.6 million to obtain them. Interpreting the word "give" in accordance with its plain meaning, see United States v. Holroyd, 732 F.2d 1122, 1125 (2d Cir.1984), we believe that Rosenthal gave Solomon a "thing of value." Rosenthal provided Solomon with the means of obtaining the losses by executing, at Solomon's request, the securities transactions upon which the losses were based. Whether or not Solomon paid for the losses is immaterial. Section 1954 does not require that the "thing of value" be given for free, or even at a discount to market value. See Ostrander, 999 F.2d at 31. In sum, we are satisfied that a reasonable jury could have found that Rosenthal gave Solomon a "thing of value" within the meaning of § 1954.

### III. Sufficiency of the Evidence Regarding Rosenthal's Intent

Rosenthal's third claim is that the evidence produced at trial was insufficient for the jury to conclude that, in arranging the 1985 Tax Trades, Rosenthal acted "because of or with the intent to influence" Solomon's position as a pension fund manager.

■ It is well established that a defendant challenging the sufficiency of the evidence underlying a conviction bears "a very heavy burden." United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir.) (citing United States v. Zabare, 871 F.2d 282, 286 (2d Cir.), cert. denied, 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989)), cert. denied, — U.S. ——, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992). A conviction will be upheld if, "after viewing the evidence in the light most favorable to the prosecution," the reviewing court finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original and citation omitted). "The jury must have [had] a full opportunity to determine credibility, weigh the evidence, and draw justifiable inferences of fact, ... and all permissible inferences must be construed in favor of the government." United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir.1992) (citation and internal quotation marks omitted). The evidence need not eliminate every possible theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction. See Ragosta, 970 F.2d at 1090.

■ Rosenthal contends that the prosecution relied on the alleged evidence of Milken's intent to influence Solomon as proving Rosenthal's intent. Although Milken denied authorizing the 1985 Tax Trades for the purpose of inducing Solomon to do business with Drexel, he acknowledged that they were "an account accommodation," and that Solomon was an "unusual account." The jury could properly have found that Rosenthal shared Milken's desire to accommodate Solomon, especially considering that the evidence demonstrated that Solomon controlled pension funds worth approximately $2 billion and did a great deal of business with Drexel's High Yield Bond Department. Further inferences could be drawn from the fact that the overall business of Solomon's investment advisory company, SAM, had grown significantly while, at the same time, a significant portion of its business with Drexel—that part which involved the secondary trading of high yield bonds—had drastically declined. Drexel, long the pre-eminent leader in high yield bonds, found itself competing with an ever-larger array of rivals for Solomon's business. Finally, Solomon and Milken both testified that Rosenthal understood that the purpose of the 1985 Tax Trades was to generate personal losses for Solomon. Such an accommodation was likely to insure that Drexel would remain in Solomon's favor. We conclude that there was sufficient evidence presented to the jury from which it could conclude that Rosenthal acted with intent to influence Solomon in his position as a pension fund manager.

### CONCLUSION

Accordingly, we affirm Rosenthal's conviction.